# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### URBANA DIVISION

| | |
|---|---|
| MISTI SMITLEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| VILLAGE OF OAKWOOD, a Municipal | ) |
| Corporation in Vermilion County, Illinois; | ) Case No:  2:22-cv-2137 |
| CHIEF OF POLICE RONALD SODERSTROM; | ) |
| AND MAYOR HEATHER MCARTY, | ) |
| | ) |
| Defendants. | ) |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

NOW COMES Defendants, VILLAGE OF OAKWOOD ("Oakwood), RONALD SODERSTROM ("Chief Soderstrom"), and MAYOR HEATHER MCARTY ("Mayor McArty"), by and through their attorneys, Tressler, LLP, and pursuant to Federal Rule of Civil Procedure 56 and Local Rule 7.1 move this Honorable Court for an order granting summary judgment in their favor.  In support of this Motion, Defendants state as follows:

## INTRODUCTION

This case involves the termination of a probationary officer, Plaintiff Misti Smitley, based on well documented and undisputed job abandonment that occurred during her short tenure as a school resource officer for the Village of Oakwood.  Plaintiff abandoned her position for twenty-four days from a period of November 19, 2021 to the date of her termination on December 13, 2021.  Moreover, based on plaintiff's doctor's opinions and testimony, Plaintiff could not perform the essential function of her job, even with an accommodation.

Plaintiff has now brought this suit alleging various claims of discrimination, retaliation, violation of the Illinois Whistleblower Act, and tortious interference with advantageous business relations. Defendants move for summary judgment.  There is not a scintilla of evidence showing that the termination decision of Plaintiff Misti Smitley was motivated by Plaintiff's alleged disability or gender. The termination decision was motivated solely by the Defendants' honest belief that Plaintiff had abandoned her position as the sole school resource officer.  The fact that Plaintiff may disagree with that decision or the basis for that decision is not material.  She cannot ultimately prove that the decision was a pretext for discrimination.

## UNDISPUTED MATERIAL FACTS

### Parties

1.      Plaintiff Misti Smitley is a female who was hired as a full-time probationary school resource officer ("SRO") with the Village of Oakwood beginning on or around July 19, 2021. [Exhibit C, Deposition of Ronald Soderstrom at p. 72:18-21; Exhibit D, 8 Section 8.2 Employment policy]

2.      Defendant Heather McArty assumed the position of Mayor of Oakwood in April 2021.  [Exhibit B, Deposition of Heather McArty at p.15:8-12]  Mrs. McArty's duties as Mayor of Oakwood included the hiring and firing of employees, including police officers.  [Exhibit B, McArty Dep., p.7:9-17]

3.      Defendant Ronald Soderstrom ("Chief Soderstrom") has served as the Chief of Oakwood Police Department since 2019.  [Exhibit C, Soderstrom Dep., p.10: 3 and at p.11: 1-3]. Chief Soderstrom's duties as the Chief of Police included overseeing the runnings and workings of the entire department on a day-to-day basis.  *Id* at p. 12:9-12.

*Plaintiff's Part-Time Employment With Oakwood*

    **4.**      Plaintiff Misti Smitley was intially hired part-time by the Village of Oakwood Police Department on or about December 17, 2019. [ Exhibit H 5.12 Statement]

    **5.**      The Board and the Mayor require part-time officers to work two shifts a month to maintain their active commission.  After approximately three to four months of not picking up any shifts, Chief Soderstrom moves officers from an active status to in-active status.  Once the officer is placed on in-active status, he or she has to re-apply for employment and the probationary period restarts.  [Exhibit C, Soderstrom Dep.,  at p. 27:15-19 and at p. 123: 4-8]

    **6.**      Furthermore, pursuant to the Oakwood Police Department Departmental Manual, "all part-time officers must work a minimum of 100 hours per year to be retained as an Oakwood Police Officer."  [Exhibit  D, 8 section 8.2 Employment Policy]

    **7.**      Mrs. Smitley worked only six shifts after being hired part-time with the Village of Oakwood, with her last shift being in March 2020.  [ Exhibit H 5.12 Statement]

    **8.**      Mrs. Smitley was moved to in-active status by Chief Soderstrom in June or July 2020 because her last shift worked as a part-time officer was in March 2020. Because Mrs. Smitley had not worked any shifts in numerous months, she was not retained as an active part-time Oakwood police officer. Mrs. Smitley was eligible for re-hire should a position open with the Oakwood Police Department for which she was qualified.  [ Exhibit C, Soderstrom Dep, at p. 30: 23- 31:1-6] and [Exhibit D, 8 Section 8.2 Employment Policy].

*Plaintiff's Full-Time Employment with Oakwood as School Resource Officer*

    **9.**      In May 2021, Mrs. Smitley inquired about an open position as a School Resource Officer ("SRO") with the Oakwood Police Department. [Exhibit C, Soderstrom Dep. at p. 57: 16-24]

10.     The School Resource Officer ("SRO") in Oakwood acts as a guardian of the schools to ensure that schools are safe.  The SRO engages with students and works alongside teachers and counselors to provide a police presence.  They assist in dealing with issues that are police matters in the elementary, middle, and high school.  [Exhibit C, Soderstrom Dep at p.45: 12-23; Exhibit E, Section 7.2 Division Responsibilities].

11.     The SRO is assigned to the Oakwood Unit 76 School District to perform duties there pursuant to an inter-agency agreement signed by the Mayor of the Village of Oakwood and the Superintendent of the Oakwood Unit 76 School District.  The SRO is required to become certified as an SRO Officer, attend A.L.I.C.E training, and become a certified juvenile officer. They work with all three schools as needed or by the direction of school administration [Exhibit F, Section 7.4.0 Specialized Units].

12.     The Mayor met with Chief Soderstrom and Mrs. Smitley at Village Hall on May 28, 2021 to interview her for the SRO position in Oakwood.  [Exhibit B, McArty Dep. p. 24:7-25 and p. 25:1-2]

13.      Immediately following this meeting, Mrs. Smitley accepted the SRO position under the following terms and conditions:

   a.  Hourly pay rate of $20.50; [Exhibit J, Deposition Deposition of Misti Smitley, p. 43-44; Exhibit B, McArty Dep. p. 31; Exhibit C, Soderstrom Dep. at p.51: 6-12; Exhibit H 5.12 statement]

   b.  Hired in at the higher rank of Sergeant (sharing the same rank as her husband) [Exhibit C, Soderstrom Dep. at p.51: 6-12; Exhibit J, Smitley Dep., p. 43:15-22; Exhibit H 5.12 statement]

**c.**  Immediate health insurance coverage – waiving the 90-day waiting period; [Exhibit C, Soderstrom Dep. at p 124: 3-7; Exhibit J, Smitley Dep., p. 44:7-16; Exhibit H 5.12 statement]

**d.**  90-day waiting period for life insurance and 365 days/1500 hours for deferred compensation/retirement package. [Exhibit C, Soderstrom Dep. at p. 124: 16-25 and p. 125:1-9] ; and

**e.**  18-month probationary period as applicable to all new hire Oakwood Police Officers.  [Exhibit D, 8 Section 8.2 Employment policy and Exhibit B, McArty Dep. p.at 88:14-17; Exhibit C, Soderstrom Dep., at p. 70:10-21; p. 114:22-23; Exhibit H 5.12 statement]

**14.**  For new full-time hires,  the Oakwood Police Department requires: (1) a health insurance waiting period; and (2) an 18-month probationary period through the Oakwood Police Department.  As a term of Mrs. Smitley's new full-time employment, the Mayor agreed to waive the initial health insurance waiting period because Mrs. Smitley would lose health insurance coverage by resigning her position as a patrol officer at Westville to take the SRO position at Oakwood.  Mrs. Smitley was to be enrolled in health insurance immediately upon starting employment with Oakwood.  However, the Mayor did not waive the 18-month probationary period for the new police hire.  Therefore, Mrs. Smitley was still subject to the 18-month probationary period as outlined in Oakwood Police Department Manual 8 Section 8.2.  [Exhibit D, Section 8.2 Employment Policy;  Exhibit H 5.12 statement; 8 Section 8.2 Employment policy]

**15.**  Neither Chief Soderstrom nor Mayor McArty are medical professionals.   The Mayor did not have a deep understanding of Mrs. Smitley's medical condition at the time she was hired as a full-time SRO.  Mrs. Smitley advised both the Mayor and Chief Soderstrom that her

medical condition was "in remission" at the May 28, 2021 interview. The Mayor interpreted Mrs. Smitley's status as "in remission" to being similar to that of a cancer patient. [Exhibit B, McArty Dep., at p. 17:6-7 and p. 19:12-16; Exhibit C, Soderstrom Dep., at p. 123:14-23]. At this May 28, 2021 meeting, Mrs. Smitley advised the Chief and the Mayor that she would only need an "occasional" doctor's visit here or there. [Exhibit C, Soderstrom Dep., at p. 63:15-20; p. 123]. Completely unbeknownst to both Mayor McArty and Chief Soderstrom, Mrs. Smitley was already undergoing extensive medical treatment, including at the Cleveland Clinic, at this time.   [Exhibit L, Deposition of Dr. Bravo at 21:20-24 and at 22:1-15; Exhibit M, Christie Clinic Medical Records CHRISTIE CLINIC 000534-000540; Exhibit N Cleveland Clinic Records, CLEVELAND CLINIC 414-417; Exhibit P Deposition of Dr. Stewart  at 23:13-17]

16.    On May 28, 2021 at the interview with the Mayor and Chief Soderstrom, Mrs. Smitley did not request any accommodations pertaining to a more flexible schedule due to her medical condition.  [Exhibit C, Soderstrom Dep., at p 63:12-24; Exhibit X – November 24, 2021 Correspondence].  Chief Soderstrom advised Ms. Smitley that she had the authority, within reason, to adjust her own hours based on the needs of the schools.  The Chief simply needed to know her hours in advance. [Exhibit C, Soderstrom Dep., at p 66:12-16 and Exhibit G, Deposition of Kyle Smitley at 12:1-4]

17.    Mrs. Smitley's first day of employment as the SRO was on or about July 19, 2021. She did not return the signed Member Enrollment Form for health insurance benefits to the Village of Oakwood until July 28, 2021.  The health insurance enrollment was immediately processed once Mrs. Smitley returned the enrollment form notating the specific healthcare plan of her choosing.  She was enrolled in healthcare insurance a month after she started with the Village of Oakwood Police Department.  The insurance enrollment was backdated to her first date of

employment of July 19, 2021.  [Exhibit I, Julie Leverenz at 29:6-8; Exhibit J, Smitley Dep., p 147:2-10].

18.     Mrs. Smitley allegedly incurred out-of-pocket expenses for one doctor's appointment on July 28, 2021 while her health insurance enrollment was processing.  Per directive from the Mayor, all expenses associated with this visit were to be reimbursed once Mrs. Smitley provided receipts.  To date, Mrs. Smitley has never provided any receipts of the expenses for out-of-pocket expenses associated with this doctor's appointment.  Therefore, the Village of Oakwood has not been able to issue payment.  [Exhibit C, Soderstrom Dep., at p.86:2-17; McArty Dep at p. 86]

19.     The Oakwood Police Department Departmental Manual includes an employment policy that expressly addresses the probationary period for officers.  Pursuant to the Manual:

> "All Officers will serve an 18-Month probationary period from the time of appointment, and this will include all part-time as well as full time positions.  Upon completion of this period, the Officer will be evaluated, and his full retention will be based on performance of work duties and reliability."  [Exhibit D 8 Section 8.2 Employment Policy]

20.     When Mrs. Smitley was hired, she was provided and signed a copy of the Oakwood Police Department Manual which outlined the required 18-month probationary period for newly hired officers. [Exhibit C, Soderstrom Dep ., at p.34:16-21]

**Pay Raise**

21.     At the time, raises for Oakwood Police Officers were reviewed in October 2021. [Exhibit B, McArty Dep. at p. 44:14-16].

22.     After the Board reviewed the salaries, Mrs. Smitley was not provided a raise in October 2021. [Exhibit B, McArty Dep. at p. 44: 17-18]

23.     In 2021, Chief Soderstrom was earning $19.00 an hour.   In the fall 2021, he received a 3% pay raise.  His salary was then increased to $19.80. [Exhibit C, Soderstrom Dep. at 22:14-16]

24.     It was determined that Mrs. Smitley was not eligible for a pay raise in October 2021 because she had only been working for the Village for just over two months at the time raises were evaluated. [Exhibit B, McArty Dep. at p. at 44: 17-18; Exhibit C, Soderstrom Dep. at p. 82]

25.     It was futher determined that Mrs. Smitley would not be eligible for a pay raise in October 2021 because she was hired at a very high initial salary. [Exhibit B, McArty Dep. at p. at 32: 12-17]

26.     As a part-time officer, Ms. Smitley was earning $17.50 an hour.  After she was re-hired as a full-time SRO, Ms. Smitley was hired at $20.50.  At, $20.50 an hour, Ms. Smitley was earning substantially more than other employees, including the Chief of Police, Ron Soderstrom. [Exhibit B, McArty Dep. at p. 45: 3-6; Exhibit W Pay Stubs]

27.     Misti was advised that the Village would re-evaluate her pay raise at her one year anniversary in 2022.  [Exhibit B, McArty Dep. at p. 49: 2-10]

***Deputy Chief Position***

28.     At the time Ms. Smitley was hired, the Village of Oakwood did not have a Deputy Chief position. At that time, Oakwood Police Department was not looking to replace the former Deputy Chief.  [Exhibit B, McArty Dep. at p. 33:7-14; Exhibit C, Soderstrom Dep. at p. 50:6-8.]

29.     In July 2021, Oakwood Police Department did not have a sergeant position prior to Mrs. Smitley.  However, they made an exception for Mrs. Smitley. [Exhibit B, McArty Dep. at p. 8:15-23]

30.     Despite no experience as an SRO, Chief Soderstrom and the Mayor agreed to promote Mrs. Smitley to Sergeant upon hiring her full-time as the School Resource Officer.  Being hired as a Sergeant was an increase in rank.  She had never been a sergeant anywhere prior to that. [Exhibit J, Smitley Dep. at p. 43:15-22]

31.     The promotion of Mrs. Smitley to Sergeant was mainly symbolic in nature.  Mrs. Smitley would then carry the same rank as her husband, Kyle, who is a Sergeant at the Vermillion County Sheriffs Department. [ Exhibit H 5.12 statement]

32.     Anthony Juvinall, a patrol officer at Oakwood Police Department did not recall any conversations about Mrs. Smitley being promoted to Deputy Chief. [Exhibit K, Deposition of Anthony Juvinall at 49:25-50:1-4]

33.     At no time did Chief Soderstrom suggest to the Mayor that Mrs. Smitley should be promoted to the Deputy Chief.  [Exhibit B, McArty Dep. at p. 33: 9-11]

34.     At no time did Chief Soderstrom or the Mayor guarantee or promise Mrs. Smitley that  she would be promoted to Deputy Chief at the Oakwood Police Department.  In fact, Chief Soderstrom never discussed the Deputy Chief position with Mrs. Smitley at all. [Exhibit C, Soderstrom Dep.  at p. 66:17-22, 125: 22-24, Exhibit B, McArty Dep. at p. at 33:7-11 and Exhibit, H 5.12 Statement]

***Comparators – Anthony Juvinall and Ronald Soderstrom***

35.     In 2021, There were eight total employees at the Oakwood Police Department.  This includes only three full-time employees and five part-time employees. [Exhibit C, Soderstrom Dep. at p. 16:13-19]

36.     In 2021, the only full-time employees were Police Chief Ronald Soderstrom, Patrol Officer Anthony Juvinall, and School Resource Officer Misti Smitley. [Exhibit C, Soderstrom Dep. at p. 28]

37.     Anthony Juvinall was first hired by Oakwood in March 2021.  Mr. Juvinall was originally hired as a part-time patrolman without benefits.  However, he regularly worked full-time hours.  Mr. Juvinall changed over to a full-time patrolman with benefits in June 2021. [Exhibit K, Deposition of Anthony Juvinall at p. 16-18.

38.     A patrolman in Oakwood is responsible for investigation of traffic crashes, preliminary investigations of criminal and other offenses, enforcement of criminal and traffic laws, protection of life, rights of others, and property, and general patrol duties.  [Exhibit E, Section 7.2 Division Responsibilities].

39.     Both the Chief Soderstrom and Mr. Juvinall earned a lower hourly wage than Mrs. Smitley.  After Mr. Juvinall became full-time in June 2021, his rate of pay was $19.00 per hour.  Currently, Mr. Juvinall earns $22.00 per hour.   [Exhibit K, Deposition of Anthony Juvinall at p. 24].

40.     Both Chief Soderstrom and Mr. Juvinall received a 3% raise in October 2021, making their pay approximately $19.80 per hour.  All Oakwood employees, with the exception of Mrs. Smitley, who was new, received a 3% raise in October 2021.  Mr. Juvinall received a raise in October 2021 because he had been employed with Oakwood for over six months by the time raises were evaluated.  [Exhibit C, Soderstrom Dep. at p. 22-23]

41.     Mrs. Smitley admitted that there was no one similarly situated to her at the time as an SRO in Oakwood in 2021.  [Exhibit J Smitley Dep., p 84:8-12].  Mrs. Smitley was the only

SRO in Oakwood from July 17, 2021 to December 13, 2021.  [Exhibit J Smitley Dep., p 56:25 and p.57:1-5]

***Relevant Timeline***

42. ███████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████ ████████████

███████████████████████████████████████████

████████████████████

43. ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

44. ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████

45. ███████████████████████████████████

███████████████████████████████████████████

████████████ ████████████████████████████████

██████████████████████████████████████

46. ████████████████████████████████████████

███████████████████████████████████████████,

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████

47.     On May 27, 2021, the day immediately prior to her interview with the Mayor and Chief Soderstrom for the SRO position, Mrs. Smitley presented for an appointment with Dr. Stewart at the Christie Clinic. Her symptoms were continuing to worsen at this time.  She████████

███████████████████████████████████████████████████████

████████████████████████████████

48.     On May 28, 2021, Mrs. Smitley interviewed for the SRO position at Oakwood Police Department with Chief Soderstrom and the Mayor.  At this time, she advised her condition was "in remission."  [Exhibit B, Deposition of Heather Mcarty at 19:12-16]

49.     Mrs. Smitley was enrolled in the SRO certification school in June and attended this class while still working for the Westville Police Department.  Mrs. Smitley was also sent to ALICE training and Juvenile Officer Certification Training.  [Exhibit H, 5.12 Statement].  After completing the required certifications, Mrs. Smitley's first day as the full-time SRO was July, 17, 2021. [Exhibit H 5.12 statement]

50.     █████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

12

████████████  ████████████████████████

██████████████████████

██  ██████████████████████████████████

█████████████████████████████████████████

███████████████████████████

52.    Mrs. Smitley's last regularly scheduled work day was on October 28, 2021 [Exhibit O Time cards]. As of November 1, 2021, Ms. Smitley had 45.75 hours of compensatory time and 4 accrued sick days. (Exhibit Q 11.30 memo memorandum and Exhibit O Time cards] ████████

██████████████████████████████████████

████████████████████  ██████████████████ █

█████████████████████████████████████████

████████████████████████████████  ████████

█████████████████████████████████████████

██

53.    Mrs. Smitley used eight hours of compensatory time for a doctor's appointment on November 1, 2021. The following day, on November 2, 2021, Mrs. Smitley did not report to work and used an additional eight hours of compensatory time. She was deducted eight hours of compensatory time for each day, for a total of sixteen hours. [Exhibit Q 11.30 memo]. On or about November 3, 2021, Chief Soderstrom texted Mrs. Smitley that he would need a note from her doctor when she was ready to come back to full duty, especially given the eye/sight issues. [Exhibit R Text Messages #1]

54.    ████████████████████████████████████

█████████████████████████████████████████

██████████████  ██████████████████████████  ███████████

███████████████████████

55.     On November 5, 2021, the school in which Mrs. Smitley was assigned was out on remote learning due to COVID-19.  An accommodation was provided allowing for Mrs. Smitley to work from home for these three days. [Exhibit R, Text Messages #1 and  Exhibit H 5.12 statement]

56.     █████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████  ███████████████████████

██████████████████████

57.     Mrs. Smitley was scheduled for use of force training in Urbana, Illinois on November 8, 2021.  She did not appear for this training.  Rather, Mr. Smitley notified Chief Soderstrom they were going to the Cleveland Clinic for an appointment. [Exhibit H, 5.12 Statement]

58.     █████████████████████████████████████

███████████████████████████████████████  ███████████

█████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████

59.     Mrs. Smitley used eight hours of compensatory time per day for November 8, 9, and 10th for a total of twenty-four (24) hours.  This left her with 5.75 hours of unused compensatory time.  November 11, 2021 was a holiday and she was off work with pay.  [Exhibit Q, 11/30 Memorandum]

**60.** 

**61.**     Mrs. Smitley then used sick days on November 12, 15, 16, 17, and 18, 2021. Mrs. Smitley accured a fifth sick day for November and that was used on November 18, 2021. [Exhibit Q, 11/30 Memorandum]

**62.**

**63.**

**64.**     The Mayor was aware that Mrs. Smitley was treated at the Cleveland Clinic. She was concerned about Mrs. Smitley's well-being as she had not updated Chief Soderstrom as to when they could expect her back to work, her status, or if she was cleared to return without restrictions [Exhibit B, Deposition Transcript of Heather Mcarty at 57:17-25 and at 58:1-4 ].

**65.**     The Mayor asked Chief Soderstrom to draft a brief memorandum to Mrs. Smitley on November 18, 2021 to advise Mrs. Smitley of her remaining compensatory time and sick days

as she had missed a significant amount of time from work.  [Exhibit B, Deposition Transcript of Heather McArty at 60:7-9] This memorandum dated November 18, 2021 was not a termination notice but rather just an update as to her remaining leave benefits. [Exhibit B, Deposition Transcript of Heather McArty at 62:18-25 and 63:1-5 and Exhibit,  U, 11/18 Memorandum]

66.     On November 19, 2021, Mrs. Smitley returned to work unannounced and unexpected.  She was wearing her uniform and proceeded to take the patrol car and report to the grade school . Neither the Mayor nor Chief Soderstrom were at Village Hall when Mrs. Smitley returned.  [Exhibit B, Deposition Transcript of Heather Mcarty at 65:4-25 ]

67.     Mrs. Smitley found the November 18, 2021 memorandum in her inbox at the station and demanded to speak with Chief Soderstrom or the Mayor.  Julie Leverenz advised Mrs. Smitley that Chief Soderstrom was on vacation.  The Mayor was available to speak via telephone later that afternoon. . [Exhibit B, Deposition Transcript of Heather Mcarty at 65:4-25 ]

68.     In the early afternoon of November 19, 2021, the Mayor called Mrs. Smitley to discuss her return to work.  Mrs. Smitley advised that she was still having issues with her leg. The Mayor heard that Mrs. Smitley was slurring her speech over the phone. [Exhibit B, Deposition Transcript of Heather McArty at 65:4-25, at 66:22-25 and at 67:1-13. ] The Mayor asked Mrs. Smitley if she had a medical note from her physician showing that she has no restrictions. Originally, Mrs. Smitley advised that she did have a note.  The Mayor asked Mrs. Smitley to email it, text it, or drive it to her in person. [Exhibit B, Deposition Transcript of Heather Mcarty at 65:4-25 and at 75:1-11]

69.     After being asked for a photograph of a medical note from her provider with no restrictions, Mrs. Smitley advised the Mayor that she did not have the medical note with her but

rather it was located in her vehicle at the Police Department. [Exhibit B, Deposition Transcript of Heather McArty at 65:4-25]

70.    The Mayor advised Mrs. Smitley to leave the grade school immediately.  The Mayor needed to review the medical note before Mrs. Smitley was able to resume her working activities.  The Mayor advised Mrs. Smitley that she was not permitted to work if she was not medically cleared to do so. [Exhibit B, McArty Dep. at p. 65:24-25; p. 66 at 1-6; p. 68:1-8 and at 70:6-12]

71.    After leaving the grade school, Mrs. Smitley clocked out with the County.  She never advised the Mayor or Chief Soderstrom that she was not returning to work.  [Exhibit B, McArty Dep. at p. 66: 7-11, and at p. 70:6-12]

72.    After retaining legal counsel, Mrs. Smitley, through her counsel sent written correspondence to the Mayor dated November 24, 2021.  This letter attached a medical note signed by Dr. Stewart at the Christie Clinic on November 18, 2021.  This was the first time that the Mayor received any type of medical documentation from Mrs. Smitley.  Identical to the first return to work note, this note did not provide an unrestricted medical clearance.  Rather, it only excused Mrs. Smitley from work from November 8, 2021 through November 18, 2021.  Furthermore, this written letter from counsel concedes that Mrs. Smitley did not request any type of reasonable accommodation. [Exhibit B, McArty Dep. at p 93:7-22 and at  94:11-16; Exhibit S, November 18, 2021 Note; Exhibit X – November 24, 2021 Correspondence ]

73.    Dr. Stewart testified that Mrs. Smitley requested a work excuse letter.  The November 18, 2021 note signed by Dr. Stewart is just a general letter that does not address work restrictions.  The work excuse signed by Dr. Stewart does not address restrictions as to what Mrs. Smitley can or can't do at work [Exhibit P, Deposition Transcript of Dr. Stewart at 39:19-23]

17

74.     At no point did Mrs. Smitley reach out to Dr. Stewart for clarification on whether she was able to return to work without restrictions. [Exhibit P, Deposition Transcript of Dr. Stewart at 36:6-12]

75.     Dr. Stewart testified that at the November 15, 2021 appointment, Mrs. Smitley was actively being treated by several specialists and she was still sick. [Exhibit P, Deposition Transcript of Dr. Stewart at 35:1-4] She had vision loss, left-sided sensory deficit, left-sided weakness, vision disturbances, electric shock, and inability to walk.  With all of those symptoms present, Mrs. Smitley could barely function let alone return to any form of employment, especially that of a police officer. [Exhibit P, Deposition Transcript of Dr. Stewart at 35:6-12 at 49:20-22 and at 50: 4-8]

76.     █████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████

77.     █████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

78.     Mrs. Smitley did not return to work after November 19, 2021. [Exhibit O Time cards; Exhibit B, McArty Dep. at p. 94:5-10; Exhibit C, Soderstrom Dep., at p. 106]  Mrs. Smitley did not communicate with either the Mayor or Chief Soderstrom following November 19, 2021. [Exhibit B, Deposition Transcript of Heather Mcarty at 94:5-7; Exhibit C, Soderstrom Dep., at p. 106]

79.     Village of Oakwood Employee Handbook Policy provides for that following pertaining to job abandonment:

> Employees must obtain affirmative confirmation of approved time away from work.  An unexcused absence for a full workday will be considered job abandonment.  The Village of Oakwood may consider this an unannounced voluntary separation of employment by the employee.  If such determination is made, the Village of Oadkwood will promptly suspend all pay and benefits and take similar action in the same manner as if the separation were announced.  All rights for continued benefit coverage under applicable law will be extended except for any benefit premium subsidey by the Village of Oakwood.  Employees that separate employment with the Village of Oakwood under the definition of job abandonment are not eligible for rehire for a period of 5 years.

80.     Pursuant to the Village of Oakwood Employee Handbook and Village of Oakwood Ordinance 45-15-A-8, Mrs. Smitley had been absent from work for greater than five days.  In fact, Mrs. Smitley was absent from work without contact or communication for twenty-four days from November 19, 2021 to December 13, 2021.  Mrs. Smitley started using her unpaid leave days on November 23, 2021.  Mrs. Smitley remained on unpaid leave from November 23, 2021 until her date of termination on December 13, 2021.   [Exhibit V Notice of Separation Letter; Exhibit Q, Memorandum and Timecards]

81.     Therefore, as of December 13, 2021, Mrs. Smitley was terminated from the Oakwood Police Department for job abandonment. [Exhibit V, Notice of Separation Letter and Exhibit  B, Deposition Transcript of Heather Mcarty at 94:20-25]

**82.**     Mrs. Smitley returned to Dr. Bravo on December 29, 2021.  At that time, she was

still sick. [Exhibit, P Deposition of Dr. Stewart at 49:20-22]

### ARGUMENT

### I.     SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the pleadings, depositions, answers to interrogatories and

admissions on file, together with the affidavits, show that there is no genuine issue as to any

material fact, and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ.

P. 56(c). The mere existence of a factual dispute will not preclude the granting of a motion for

summary judgment where the dispute does not involve a material fact. *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Material facts are identified by the substantive law

involved, and to constitute a "genuine issue," the evidence must be such that a reasonable jury

could return a verdict for the nonmoving party. *Id*. The party seeking summary judgment bears

the initial burden of proving there is no genuine issue of material fact. *Celotex Corp. v. Catrett*,

477 U.S. 317, 323 (1986). The nonmoving party cannot rest on mere pleadings alone but must

use evidentiary tools to designate specific material facts showing that there is a genuine issue for

trial. *Id.* at 324.

### II.     THE UNDISPUTED EVIDENCE DEMONSTRATES THAT PLAINTIFF WAS NOT DISCRIMINATED AGAINST ON ACCOUNT OF A DISABILITY

This Court should dismiss Plaintiff's disability discrimination causes of action (Counts I

and II) because she cannot establish a viable claim against the Defendants.  Plaintiff alleges that

Defendants discriminated against Plaintiff by treating her differently from, and less preferably

than, similarly situated non-disabled employees, and subjecting her to discriminatory pay,

discriminatory denials of pay raises, and other differential treatment on the basis of her disability.

Plaintiff further alleges that she requested an accommodation at the time she was hired by stating

that she would need to take occasional medical leave in order to receive treatment for her disability.  These allegations are without merit.

In this case, Plaintiff is not a qualified disabled individual under the IHRA.  The court's holding in *Severson* applies to Plaintiff's IHRA failure to accommodate and disability discrimination claims.  Since Plaintiff could not perform her job, she was not a qualified disabled person under the IHRA.  Thus, Defendants are entitled to summary judgment.

## A. Plaintiff Was Not a Qualified Disabled Individual Because of Lack of Regular Attendance

Illinois Courts look to analogous federal law when interpreting the Illinois Human Rights Act. See *Burns v. Bombela-Tobias*, 169 N.E.3d 773, 784 (Ill. App. 2020) (discussing the legal standard for age and disability claims under the Illinois Human Rights Act and explaining that "Illinois courts look to the decisions of the United States Supreme Court and the United States Court of Appeals for the Seventh Circuit in interpreting the Act"). Therefore, Courts analyze claims of disability discrimination under the IHRA using the same framework as the Americans with Disabilities Act ("ADA"). See *Keen v. Merck Sharp & Dohme Corp*., No. 15-CV-1 178, 2018 WL 1156203, (N.D. Ill. Mar. 5, 2018), aff'd, 819 F. App'x 423 (7th Cir. 2020) (analyzing IHRA disability claim under ADA framework); *Knapp v. Evgeros*, Inc., 205 F. Supp. 3d 946, 958 (N.D. Ill. 2016) ("[C]ourts analyze IHRA disability claims for discriminatory intent the same way that they analyze ADA claims."); see also *Luckett v. Human Rights Comm'n,* 210 Ill.App.3d 169, 180 (1989) ("When analyzing claims of discrimination under the [IHRA], Illinois courts have looked to the standards applicable to analogous federal claims.")

In order to establish a prima facie case of discrimination under the ADA and IHRA, the Plaintiff must establish that (1) she was disabled under the law; (2) she suffered an adverse employment action; and (3) the circumstances surrounding the employment action indicated that it was more likely than not that her disability was the reason for the actions taken. *Leffel v. Valley Financial Services*, 113 F.3d 787, 794 (7th Cir. 1997) (citing *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 58 (4th Cir. 1995).

The protections of the ADA extend only to "qualified individuals" with a disability. *Basith v. Cook County*, 241 F.3d 919, 927 (7th Cir. 2001). In determining whether a person is a "qualified individual" under the ADA, courts undertake a two-part inquiry and consider whether, at the time of the termination decision, the employee: 1) satisfies the employer's legitimate selection criterion for the job; and 2) is capable of performing the job's "essential functions" with or without reasonable accommodation from an employer. *Id.*; *Bay v. Cassens Transp. Co.*, 212 F.3d 969, 974 (7th Cir. 2000). Indeed, if an individual requires a multi-month leave of absence because of a disability, she is not a qualified disabled person under the ADA. See *Severson v. Heartland Woodcraft*, Inc., 872 F.3d 476, 479 (7th Cir. 2017).

In *Severson*, plaintiff-employee Severson had exhausted his FMLA allotment after an extended medical leave. *Id*. Severson spoke to his employer on August 13, 2013 and requested a (fixed) 3-month leave effective August 27, 2013, the day of his surgery and the day his FMLA ended. *Id*. Severson did not speak to his employer again until August 26, 2013, at which time his employer advised him that he would be terminated the next day when his FMLA leave expired. *Id*. 479-480. On October 17, 2013, Severson's physician released him with restrictions, and then subsequently released him to full duty starting December 5, 2013. *Id.* at 480. Severson sued his employer alleging violation of the ADA "by failing to provide a reasonable accommodation—

namely, a three-month leave of absence after his FMLA leave expired." *Id*. at 478. The court ruled

that "[t]he ADA is an antidiscrimination statute, not a medical-leave entitlement." *Id*. at 479. "An

employee who needs long-term medical leave cannot work and thus is not a 'qualified individual'

under the ADA." *Id*

An employer is generally permitted to treat regular attendance as an essential job

requirement and need not accommodate erratic or unreliable attendance. *Basden v. Pro. Transp.,*

*Inc.*, 714 F.3d 1034, 1036 (7th Cir. 2013). A plaintiff whose disability prevents her

from coming to work regularly cannot perform the essential functions of her job, and thus cannot

be a qualified individual for ADA purposes. *Id*. (citing Waggoner v. Olin Corp., 169 F.3d 481,

484-85. (7th Cir. 1999)); see also *Jovanovic v. In-Sink-Erator Div. of Emerson Elec. Co*., 201 F.3d

894, 899-900 (7th Cir. 2000) (employee missed 24 days in past 12 months; "Common sense

dictates that regular attendance is usually an essential function in most every employment setting;

if one is not present, he is usually unable to perform his job.").

In this case, the Oakwood Police Department maintains a policy that clearly outlines its

attendance requirements.  This policy section indicates that all officers will serve an 18-month

probation period from the time of appointment. [Defs' SOF, ¶ 19]. The Police Department Manual

policy also discusses weekly schedules, vacation, sick leave, and compensatory time.

Furthermore, the Village of Oakwood maintains a separate policy that clearly outlines its

attendance requirement in the event of injury or illness from a non-job related occurrence.  [Defs'

SOF, ¶ 79]. The Village of Oakwood Employee Handbook lays out the policy for employees who

abandon their post and have unexcused absences. [Defs' SOF, ¶ 79].  Oakwood, thus, undoubtedly

viewed regular and timely attendance as an essential job function.  *See Arroyo v. Volvo Grp. N.*

*Am., LLC*, 93 F.4th 1066, 1069 (7th Cir. 2024).

Mrs. Smitley undisputedly exhausted all of her earned time and was absent from her position for greater than five days.  Mrs. Smitley started using unpaid leave on November 23, 2021. [Defs' SOF, ¶ 80].  Her fifth unpaid day, according to Ordinance Section 45-15-A-8, was November 29, 2021. *Id.*  A termination letter for job abandonment was sent on December 13, 2021. *Id* at ¶ 81.  Therefore, Mrs. Smitley did not perform an essential job function regarding job attendance, barring her status as a qualified individual under the ADA or IHRA.

### B.  Plaintiff Was Not a Qualified Disabled Individual Because She Could Not Perform the Essential Functions of Her Job

Moreover, based on Plaintiff's doctor's opinions and testimony, Plaintiff could not perform the essential functions of her job, even with an accommodation. Under the IHRA, "a plaintiff who cannot, by reason of a physical condition, perform the duties of the job in question even with accommodation is not handicapped under the Act." *Van Campen v. Int'l Bus. Machines Corp.,* 326 Ill. App. 3d 963, 971 (1st Dist. 2001). "An employer's duty to accommodate…attaches when the employee asserts or claims that he or she would have performed the essentials of the job if afforded reasonable accommodation." *Illinois Bell Tel. Co. v. Human Rights Comm'n,* 190 Ill. App. 3d 1036, 1050 (1st Dist.1989); *also see Jackson v. City of Chicago,* 414 F.3d 806, 812 (7th Cir. 2005) (police officer was not quailfied under the ADA because she could not perform the essential functions of her job, even with a light duty accommodation);

From November 9 through November 12, 2021, Mrs. Smitley was ██████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████ As a result,

Chief Soderstrom advised Mrs. Smitley that she would need to submit a medical certification clearing her for active police duty. *See Kurtzhals v. Cnty. of Dunn,* 969 F.3d 725, 731 (7th Cir. 2020) (requiring plaintiff, a police officer, to submit medical certification was proper given the nature of a police officer's essential job duties). By November 15, 2021, Mrs. Smitley's medical providers confirmed that ███████████████ let alone return to any form of employment, especially that of a police officer. [Defs' SOF, ¶ 62]. ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████

    From November 19 through December 13, 2021 – twenty-four (24) days – the Village waited for Mrs. Smitley to submit her medical provider's certification confirming that she could perform the essential functions of her job, even with an accomodation. [Defs' SOF, ¶ 78]. Of course, no such certification came, and in fact, Mrs. Smitley did not communicate with the Village at all during these twenty-four days. [Defs' SOF, ¶ 78]. This comes as no surprise, because Mrs. Smitley continued to seek treatment and could not perform the essential functions of her job

████████████████████████████████████████

[Defs' SOF, ¶ 82].

    Given Plainitff's own medical provider's opinion, she could not perform the essential job duties of a School Resource Officer, or any police officer, which included, overall safety and crime prevention of Oakwood students in their elementary, middle, and high schools. Simply put, Oakwood had a responsibilty to protect its students, and Plainitff could not perform that essential job duty and therefore, she does not qualify as a disabled individual under the ADA or IHRA.

See 42 U.S.C.A 12111 (8); *Owens v. Department of Human Rights,* 356 Ill. App. 3d 46, 52 (2005). Because Plaintiff has not established the first prong of her prima facie case of each of her disability claims, then Defendant is entitled to summary judgment.

### C. Defendant is Entitled to Summary Judgment on Plaintiff's Failure-to-Accommodate Claim

Plaintiff's failure-to-accommodate claim fails for multiple independent reasons. First and foremost, because Plaintiff is not a "qualified individual with a disability," she is not entitled to a reasonable accommodation under the ADA. *Gratzl v. Office of Chief Judges*, 601 F.3d at 681 ("To be entitled to a reasonable accommodation—and thus to prove that the defendant failed to provide such a reasonable accommodation—[the plaintiff] has the burden of establishing that she is a 'qualified individual with a disability' under the ADA.") Second, Plaintiff failed to request an accommodation related to a more flexible work schedule. [Defs' SOF, ¶ 16]. *Jovanovic v. In-Sink-Erator,* 201 F.3d 894, 899-900 (7th Cir. 2000) ("[T]he standard rule is that a plaintiff must normally request an accommodation before liability under the ADA attaches."). Third, Defendants offered Plaintiff the reasonable accommodation of a modified work schedule and allowed Plaintiff to work from home the first week of November 2021. [Defs' SOF, ¶ 55]; see also *Kersting v. Wal-Mart Stores, Inc*., 250 F.3d 1109, 1116-17 (7th Cir. 2001) (holding that employer satisfied its statutory duty by providing reasonable accommodation - employee is not entitled to the accommodation he requests or prefers).

Finally, to the extent Plaintiff wanted to be able to come to work whenever she felt like it without having any discipline imposed for such conduct, such an accommodation would have been unreasonable as a matter of law. *EEOC v. Yellow Freight Sys., Inc.,* 253 F.3d 943 (7th Cir. 2001) (*en banc*) (request for unlimited number of sick days unreasonable as a matter of law);

*Amadio v. Ford Motor Co.,* 238 F.3d 919 (7th Cir. 2001) (open-ended schedule that lets employee come and go as he pleases unreasonable as a matter of law); *Jovanovic v. In-Sink-Erator,* 201 F.3d 894, 899-900 (7th Cir. 2000) (unreasonable accommodation as a matter of law to let manufacturing employee come and go as he pleased); *Waggoner v. Olin Corp.,* 169 F.3d 481 (7th Cir. 1999) (an employee's desire to miss work whenever she needed to for as long as she felt it was necessary was unreasonable as a matter of law).

## III.   THE UNDISPUTED EVIDENCE DEMONSTRATES THAT PLAINTIFF WAS NOT DISCRIMINATED AGAINST ON THE BASIS OF GENDER

For purposes of the direct method, direct evidence is evidence that, if believed by the trier of fact, would prove discriminatory conduct on the part of the employer without reliance on inference or presumption. *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003) (overruled as to another issue by *Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013)). A plaintiff can also prevail under the direct method of proof by constructing a "convincing mosaic" of circumstantial evidence that "allows a jury to infer intentional discrimination by the decisionmaker." *Id*.; *see also Troupe v. May Dept. Stores Co*., 20 F.3d 734, 736 (7th Cir. 1994). That circumstantial evidence, however, "must point directly to a discriminatory reason for the employer's action." *Adams v. Wal-Mart Stores, Inc*., 324 F.3d 935, 939 (7th Cir. 2003).

To establish a sex discrimination claim under the *McDonnell Douglas* burden-shifting analysis, a plaintiff must show: (1) she is a member of a protected class; (2) she was meeting her employer's legitimate performance expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees who were not in a protected class. *Whittaker v. Northern Illinois University*, 424 F.3d 640, 646-47 (7th Cir. 2005). If

plaintiff can establish this, the burden shifts to the defendant to provide a legitimate, nondiscriminatory reason for the challenged action. If the defendant can provide this, the plaintiff must establish that the proffered reasons were mere pretext. *Id.*

Defendants do not contest that Plaintiff is a member of a protected class as a woman or that she was subjected to an adverse employment action as it relates to her termination. However, Plaintiff has not established that she met legitimate employment expectations, or that similarly situated employees of the opposite sex were treated more favorably. Therefore, Plaintiff has not met her burden of showing a prima facie case of gender discrimination, and Defendants are entitled to summary judgment in their favor.

### A. Plaintiff Failed to Meet Oakwood's Performance Standards

Where a plaintiff is totally reliant on the McDonnell-Douglas formula, she is " 'out of luck if she can't show that she is meeting his employer's legitimate expectations.' " *Pelle v. Country Mutual Insurance Co.*, 288 F.3d 319, 328 (7th Cir.2002) (quoting *Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1009 (7th Cir.2000).) In this case, Plaintiff undisputedly had a lengthy history of attendance problems.  In fact, Chief Soderstrom drafted a memorandum to Plaintiff on November 18, 2021 letting her know where she stood with her compensatory time and sick leave as she had missed a significant amount of work. [Defs' SOF, ¶ 65].  Plaintiff began using her unpaid leave days on November 23, 2021.  Plaintiff was unable to meet Oakwood's performance standards as a result of excessive absenteeism and subsequent job abandonment.  Consequently, she is prevented from making a *prima facie* showing for gender discrimination.

### B. Plaintiff Fails to Present Evidence of A Similarly Situated Male SRO Treated Better than her

Similarly, Plaintiff alleges she was paid less than a male comparator; however, this is false. There were no male comparators at Oakwood.  Plaintiff was the only SRO for the Village of

Oakwood [Defs' SOF, ¶ 41].  In order to be an SRO, Plaintiff had special responsibilities besides those of the patrolmen, including in dealing with the schools. [Defs' SOF, ¶ 55].  The SRO is required to have certifications and training unique for the position, including the SRO certification, ALICE training, and juvenile officer certification.  [Defs' SOF, ¶ 49].  Anthony Juvinall was hired part-time as a patrolman in March 2021 and brough on full-time in June 2021.  [Defs' SOF, ¶ 37]. A patrolman in Oakwood is inherently different and does not have responsibilities pertaining to the schools.  Rather, they are generally responsible for enforcement of criminal and traffic laws and general patrol duties.  [Defs' SOF, ¶ 38*].  David v. Board of Trustees of Community College District No. 508*, 846 F.3d 216, 230 (7th Cir. 2017) (having duties in addition to otherwise similar duties does not establish a prima facie case under the EPA); *Sims-Fingers v. City of Indianapolis*, 493 F.3d 768, 771-72 (7th Cir. 2007) ("The proper domain of the Equal Pay Act consists of standardized jobs in which a man is paid significantly more than a woman (or anything more, if the jobs are truly identical) and there are no skill differences.").

Even if the only two full-time employees are found to be comparable, both Chief Soderstrom and Anthony Juvinall earned $19.00 an hour in July 2021.  [Defs' SOF, ¶ 19; ¶ 39]. Both Chief Soderstrom and Mr. Juvinall received a 3% raise in October 2021.  *Id* at ¶ 40 and ¶ 23. This still put them at a lower hourly salary than Mrs. Smitley who was earning $20.50 per hour in October 2021.  Thus, because there were no similarly situated male comparators who earned a higher wage than Mrs. Smitley, this Court should grant summary judgment on Plaintiff's EPA claims.

**IV.    DEFENDANTS HAVE PRESENTED LEGITIMATE, NON-DISCRIMINATORY REASONS FOR PLAINTIFF'S TERMINATION, WHICH PLAINTIFF HAS FAILED TO REBUT WITH EVIDENCE OF PRETEXT**

Even if Plaintiff could satisfy her *prima facie* burden, Defendants' stated reasons for termination were legitimate and non-discriminatory.  As stated above, Plaintiff did not meet the acceptable standards as it relates to attendance, job abandonment and her outright failure to submit medical documentation confirming her ability to return to work. These reasons were not even remotely based on her gender or disability. *See Bell v. Bd. of Educ. of Proviso Twp. High Sch. Dist. 209,* 662 F. App'x 460, 462 (7th Cir. 2016) (holding that job abandonment is a legitimate business reason for termination). Consequently, the burden falls back to the Plaintiff to show that the reasons for her separation were dishonest (pretexual) and that the true reason was gender or disability.  *See Senske v. Sybase, Inc*., 588 F.3d 501, 506-07 (7th Cir. 2009). *Hoffstead v. Ne. Illinois Reg'l Commuter R.R. Coproration*, No. 21 C 4335, 2023 WL 8353271 (N.D. Ill. Nov. 21, 2023)  It does not matter if the reasons were mistaken, cruel, unethical, or downright irrational. See *Forrester v. Rauland-Borg Corp.,* 453 F.3d 416, 417-18 (7th Cir. 2006). A pretext is a dishonest explanation, rather than an erroneous one. *Bodenstab v. Cnty. of Cook*, 569 F.3d 651, 657 (7th Cir. 2009). Thus, to show pretext, a plaintiff must establish that the employer's nondiscriminatory reason is "a lie intended to mask unlawful discrimination." *Liu v. Cty. of Cook*, 817 F. 3d 307, 316 (7th Cir. 2016).

Plaintiff has presented no evidence that Oakwood's stated reasons of job abandonment or her refusal to submit required medical documentation was a lie. Defendants complied with its written job abandonment policy and honestly believed that Plaintiff should be terminated based on abandonment because they had not heard from her since November 19, 2021 – twenty-four days. Furthermore, "Municipalities and their police departments have the authority, if not the duty, to

make sure that their police officers are fit for the job." *Aguilera v. Village of Hazel Crest*, 234 F. Supp. 2d 840, 851 (N.D. Ill. 2002). Defendants were well within the bounds of discretion to terminate Plaintiff's employment, consistent with its job abandonment policy, especially with a probationary employee who had no legitimate expectation of continued employment.

Illinois courts recognize that police departments hire officers with a probationary period so that they can terminate employment before permanent appointment: "The rationale for this is simple recognition that probation is literally a trial period during which the potential career officer is being evaluated by the [Chief of Police]. The period of probation enables the appointing officer to determine whether a permanent appointment is desirable, a question that by necessity is left to his or her sole judgment as appointing officer." *Brzana v. Martin*, 211 Ill. App. 3d 415, 416 (4th Dist. 1991). The employer "must be free to weed out those probationary officers who are unsuited . . . for career service" *Id.*

It is undisputed that Defendants had legitimate, non-discriminatory reasons for terminating Plaintiff.  [Defs' SOF, ¶ 78-81].  Ultimately, it is Plaintiff's burden to show that the Defendant's proffered reasons were a pretext for gender or race discrimination, i.e., that their reasons were a lie. *See Senske*, 588 F.3d at 506-507; *Paul v. Theda Med. Ctr., Inc*., 465 F.3d 790, 794 (7th Cir. 2006). Plaintiff has not met that burden with evidence sufficient to defeat summary judgment. Based on the totality of the undisputed evidence, no jury could ever conclude that Defendants' reasons for terminating Plaintiff were a pretext for gender or disability discrimination.

## V.  THE UNDISPUTED FACTS DEMONSTRATE THAT PLAINTIFF HAS NOT PROVEN A CASE FOR RETALIATION

Title VII's anti-retaliation provision prohibits an employer from discriminating against an employee because that individual opposed any practice made unlawful by Title VII. A plaintiff

can prove Title VII retaliation either through the direct or indirect method. *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003) (overruled as to another issue by *Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013). Under the direct method, Plaintiff must provide direct or circumstantial evidence showing that Defendants acted based on prohibited animus. *Mattson v. Caterpillar, Inc.*, 359 F.3d 885, 888 (7th Cir. 2004). Under the indirect method, Plaintiff must show that after complaining of discrimination, only she, and not any similarly situated employee who did not engage in protected activity, was subjected to adverse employment action even though she was performing her job in a satisfactory manner. A "similarly situated employee who did not complain" is one who is "directly comparable to [the plaintiff] in all material respects." *Grayson v. O'Neill*, 308 F.3d 808, 819 (7th Cir. 2002). Here, Plaintiff has presented no direct evidence. Therefore, she must proceed with the indirect method.

Title VII retaliation claims also require proof that the desire to retaliate was the but-for cause of the challenged employment action. *University of Tex. Sw. Med. Ctr. V. Nassar*, 133 U.S. 2517 (2013). This means that a mixed-motive theory of establishing retaliation – e.g., that a complaint about discrimination was a "motivating factor," even if the employer shows other factors also motivated the action – is not enough for a plaintiff. *Id.* at 2535. Therefore, Plaintiff must establish that her complaint was not only *a* factor in the termination decision, but that the termination would not have happened had she not made the complaint.

Here, Plaintiff is not able to establish a *prima face* claim for retaliation or retaliatory discharge. First, Mrs. Smitley could not have had a good faith belief that she was the victim of disparate pay, given that she was the highest paid police officer within the Department, even more than the Chief. S*ee Hamner v. St. Vincent Hosp. & Health Care Center, Inc*., 224 F.3d 701,

707 (7th Cir. 2000) (An employee must have: (1) a good faith belief that she is opposing a practice prohibited under Title VII, and (2) this belief is objectively reasonable).

Next, even if this court were to accept that Plaintiff had a good faith belief for her alleged pay disparity complaint, which the Defendants deny is possible, the record is clear as to the reason why Plaintiff was terminated – job abandonment.  [Defs' SOF, ¶ 78-81].  The fact that Plaintiff may or may not have attempted to address her pay disparity and other employment issues in the fall 2021 has no bearing on her termination.  Plaintiff cannot rely on the timing of her alleged complaint because the Seventh Circuit has held that "evidence regarding suspicious timing, without more, is generally insufficient to support a reasonable inference of retaliation." *Harper v. C.R. England, Inc.*, 687 F.3d 297, 309 (7th Cir. 2012). This is not one of those rare cases where timing alone supports an inference of retaliation. Simply put, there is no evidence that Defendants engaged in retaliatory conduct, rather, Plainitff was terminated for legitimate business reasons and as discussed in Section IV, Plainitff has no evidence to establish that the Defendants reason was a lie.

## VI.  PLAINTIFF'S ILLINOIS WHISTLEBLOWER CLAIM FAILS AS A MATTER OF LAW

Plaintiff alleges that Defendants violated unspecified sections of the IWA in Count VII. The Complaint fails to specify with reasonable certainty what actions Defendants allegedly engaged in that violated the IWA.  Furthermore, Plaintiff failed to specify which sections of the IWA were allegedly violated by the Defendants' conduct.  Rather, the Plaintiff simply pleads that the Defendant engaged in a pattern of retaliation against the Plaintiff.  (Complaint, Paragraph 92).

Plaintiff's IWA claims fail quite simply because Plaintiff never was a whistleblower under the IWA. Defendants dispute that Plaintiff ever blew any whistle as there is no evidence to suggest

that she ever logged a complaint prior to filing suit in this case.  To the extent that this Court disagrees and finds that Mrs. Smitley is a whistleblower, the only whistle she ever blew related to only herself and to no one other than herself. There is no evidence that she ever asserted that Defendants "violated a clear mandate of public policy because the reported wrongful conduct or unsafe condition affected the health, safety or welfare of Illinois residents as a whole." *Sutherland v. Norfolk S. Ry. Co.*, 356 Ill.App.3d 620, 627, 826 N.E.2d 1021, 1027 (1st Dist. 2005). The allegations upon which Plaintiff relies are entirely personal to Plaintiff and did not "affect that health, safety or welfare of Illinois residents as a whole." *See id.* (an employee cannot qualify as a whistleblower under the IWA merely because "reported his or her own injury and the condition that caused it."). Plaintiff has not produced any evidence to the contrary. Simply filing a claim of retaliation with the EEOC or IDHR on one's own behalf did not make Plaintiff a whistleblower. Therefore, Plaintiff cannot show a violation of the IWA.

## VII.   PLAINTIFF'S CLAIM FOR TORTIOUS INTERFERENCE WITH ADVANTAGEOUS BUSINESS FAILS AS A MATTER OF LAW

In her complaint, Plaintiff alleges that Defendant Mayor Heather McArty tortiously interfered with her legitimate expectancy of continued employment by terminating her. Under Illinois law, to prevail on a claim for tortious interference with a prospective economic advantage, a plaintiff must prove: (1) a reasonable expectation of continuing a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from such interference. *Fellhauer v. City of Geneva*, 142 Ill.2d 495, 511 (1991).

To state a cause of action for tortious interference with advantageous business in Illinois, a plaintiff must sufficiently allege interference by the defendant with a specific third party. *Schuler*

*v. Abbott Labs.*, 26 5Ill.App.3d 991, 994 (1st Dist. 1993). In other words, only when the actions of third-party result in the employer's decision to fire an employee will the third party be liable for interference with a business relationship or business expectancy. *Fellhauer*, 142 Ill.2d at 511.

Mrs. Smitley did not have the legitimate expectation of continued business with Oakwood because she was a probationary officer and served at the pleasure of the Mayor. Furthermore, Mrs. Smitley sued Mayor McArty for interfering with her business relationship with Oakwood. However, Oakwood is not a third-party to this lawsuit. In fact, Oakwood and Mayor McArty are both named Defendants. Mayor McArty was acting in the course and scope of her employment with the Village of Oakwood in terminating Mrs. Smitley. Mayor McArty could not have interfered in her own business relationship with Mrs. Smitley. Therefore, this court should dismiss Count VIII with prejudice.

## VIII. PLAINTIFF'S CLAIM FOR VIOLATION OF THE EQUAL PAY ACT FAILS AS A MATTER OF LAW

The undisputed facts demonstrated that Mrs. Smitley was paid better than any other full-time male officer at Oakwood at the time she was hired in July 2021. The undisputed facts further establish that Mrs. Smitley was the only School Resource Officer. Because Mrs. Smitley cannot identify a single male candidate with equivalent or worse qualifications who was paid more than she was, summary judgment must be entered on her Equal Pay Act claim.

Plaintiff's Gender Discrimination claim (Count III) and EPA claim (Count IX) are based on the fact that she is treated differently from and less favorably than similarly situated male employees and was subjected to discriminatory pay. At the time, there were only three full time officers in Oakwood. [Defs' SOF, ¶ 35] It was Chief Soderstrom, Patrol Officer Anthony Juvinall, and Plaintiff. *Id*. Plaintiff was the only SRO with the Village of Oakwood from July 17, 2021 to

35

December 13, 2021.  [Defs' SOF, ¶ 41].  In fact, Mrs. Smitley testified that there was no other similarly situated employee at the Village of Oakwood. *Id.*  In July 2021, both Chief Soderstrom and Anthony Juvinall were earning approximately $19.00 an hour. [Defs' SOF, ¶ 23; ¶ 39].

The Seventh Circuit "has repeatedly held that a difference in pay based on the difference in what employees were previously paid is a legitimate 'factor other than sex.'" See *Lauderdale v. Ill. Dep't of Human Servs.*, 876 F.3d 904, 907 (7th Cir. 2017). In this Circuit, "prior wages are a 'factor other than sex' such that an employer's decision to pay an employee a salary because of his or her salary at his or her previous job is not unlawful under the Equal Pay Act." *Wernsing v. Illinois Dep't. of Hum. Serv.*, 427 F.3d 466, 468 (7th Cir.2005). In fact, the Seventh Circuit has held on at least five occasions that prior wages are a "factor other than sex." *Id.*; see also *Dey v. Colt Construction & Development Co.*, 28 F.3d 1446 (7th Cir. 1994*); Riordan v. Kempiners*, 831 F.2d 690 (7th Cir. 1987); *Covington v. Southern Illinois University*, 816 F.2d 317 (7th Cir. 1987*); Lauderdale, 876* F.3d at 908.

Similar to *Lauderdale,* factors other than sex explain the pay differential between Plaintiff, Chief Soderstrom, and Anthony Juvinall. Plaintiff negotiated her pay with the mayor at the time she was originally hired.  She was making over $21.00 per hour as an officer in Westville prior to being hired at Oakwood.  Mayor McArty offered her $20.00 per hour.  Plaintiff negotiated with the Mayor and compromised to an hourly rate of $20.50 per hour for her position beginning in July 2021 as the School Resource Officer in Oakwood.  (Soderstrom, pg. 64).  After accepting a salary of $20.50, Plaintiff became the highest full-time officer with the Village of Oakwood in July 2021.  (Soderstrom, pg. 51).  Plaintiff earned $1.50 more per hour more than every other full-time officer, including the Chief of Police. Consequently, Plaintiff's EPA claim fails because she was the highest earning full-time officer at the Village of Oakwood at the time.

CONCLUSION

For the foregoing reasons, Defendants should be granted summary judgment on all of Plaintiff's claims.

**Dated:  March 22, 2024**

Respectfully submitted,

**Tressler LLP**

By: ***/s/ Jennifer A. Dancy***
Darcy L. Proctor
Jennifer A. Dancy
233 S. Wacker Drive, 61st Floor
Chicago, IL 60606
312-627-4000
dproctor@tresslerllp.com
jdancy@tresslerllp.com

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that she filed a copy of the foregoing document was filed electronically to all parties of record using the court's CM/ECF system, on this 22nd day of March 2024:

> Ronald S. Langacker
> Langacker Law, Ltd.
> 210 N. Broadway
> Urbana, Illinois 61801
> *Attorney for Plaintiff*

Respectfully submitted,

By:    */s/ Jennifer A. Dancy*
       One of the attorneys for Defendant the Village of Oakwood

Darcy Proctor,
Jennifer A. Dancy
Tressler LLP
233 S. Wacker Drive, 61st Floor
Chicago, IL 60606
(312) 627-4000
dproctor@tresslerllp.com
jdancy@tresslerllp.com