UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | |
|---|---|
| MISTI SMITLEY, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) Case No. 2:22-cv-2137 |
| vs. | ) |
| | ) |
| VILLAGE OF OAKWOOD, a Municipal | ) |
| Corporation in Vermilion County, Illinois; | ) |
| CHIEF OF POLICE RONALD SODERSTROM; | ) |
| and MAYOR HEATHER MCARTY, | ) |
| | ) |
|     Defendants. | ) |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

NOW COMES Plaintiff, Misti Smitley ("Plaintiff"), and in response to Defendant's Motion

for Summary Judgment[1], hereby responds as follows:

**INTRODUCTION**

Plaintiff Misti Smitley was recruited by Defendant Chief of Police Ronald Soderstrom

("Chief Soderstrom") for the position of School Resource Officer ("SRO") for Defendant Village of

Oakwood in May of 2021. Defendants recruited and hired Plaintiff as a full-time Student Resource

Officer ("SRO") with the full knowledge that she suffered from sarcoidosis. Defendants' knowledge

of Plaintiff's condition came in part due to a news story regarding her disability on the local news

regarindg a community benefit organized to raise money for Plaintiff's out-of-network medical costs

and travel expenses—to which both the Village of Oakwood and Mayor McArty personally

contributed. [Plaintiff's Statement of Facts ("PSOF") ¶1.] At the time Chief Soderstrom solicited

---

[1] Defendants have filed a Motion for Summary Judgment relating to eight of Plaintiff's nine Counts (I-V, and VII through IX) and are not requesting summary judgment as to Count VI (Retaliatory Discharge pursuant to the Illinois Wage and Hour Act 820 ILCS 115/14(c)).

1

Plaintiff for the SRO position, Platintiff had served as a part-time police officer for the Village of Oakwood since December 2019 and continued to serve as a part-time police officer. After meeting with Defendant Mayor Heather McArty ("Mayor McArty"), Mayor McArty offered—and Plaintiff accepted—the position of SRO with a start date of July 19, 2021 on the following terms: (1) salary of $20.50/hour, (2) no probationary period, (3) immediate qualification for health insurance, (4) immediate appointment to sergeant with the promise of promotion to Deputy Chief within a few months, (5) an increase in pay rate when raises were given, and (6) the ability to establish her own schedule.  Defendants offered Plaintiff immediate qualification for health insurance and flexibility in scheduling because they were aware that she suffered from the disability of sarcoidosis.

Plaintiff was employed with the Village of Oakwood as an SRO officer full-time from July through December of 2021. Plaintiff performed her job well, had not been disciplined for any reason, and the Village had not received any citizen complaints about her conduct. PSOF¶16. [Def. Exhibit B, McArty Dep. at p. 48:12-22].

Plaintiff suffered a flare-up of her sarcoidosis in early November and needed to take time off from work, for which she had available leave time. Her physician cleared her to return to work on November 18, 2021, and Plaintiff returned to work the next day. PSOF ¶6. When Plaintiff returned to work, she found in her inbox a memorandum from Chief Soderstrom stating she had exhausted her available leave time and would be on unpaid leave starting the following Monday, November 22, 2021. When Plaintiff attempted to discuss this issue with the Mayor, the Mayor refused to accept Plaintiff's physician note and sent her home.

On November 24, 2021, five days after Plaintiff was advised to not return to work, Plaintiff's attorney drafted a letter to the Mayor inquiring about the status of Plaintiff's employment, and requested the Mayor provide the rationale for failing to accept the physicians note. PSOF¶13. When the Village stated they had not received the physician's note from the Plaintiff, Plaintiff's attorney

2

provided another copy of the note on December 6, 2021. PSOF¶14. On December 13, 2021, the Plaintiff was terminated for "job abandonment." PSOF¶15.

Plaintiff contends that she was terminated from her employment because of her disability. At the outset of her employment, Plaintiff had requested accommodations for her disability, which were ultimately not honored by the Defendants. When she had a flare-up of her disability and returned to work on November 19, 2021, Defendants advised Plaintiff she had used up her available leave time, refused to honor her physician's note, and summarily terminated her. Plaintiff was terminated from her employment due to her disability, Defendants refused to provide any accommodations, refused to engage in the interactive process, and retaliated against Plaintiff for engaging in protected activity. For the reasons discussed below, Defendants' motion for summary judgment should be denied as to Counts I, II, and IV.[2]

### RESPONSE TO UNDISPUTED MATERIAL FACTS

**A.     Undisputed Material Facts**

The following numbered assertions of Undisputed Material Facts in Defendants' Motion are undisputed and material:  2-4, 10-12, 23, 27-29, 33, 37, 39, 44, 46, 49, 53-54, 56-59, 61, 63, 67, 69, and 74.

**B.     Disputed Material Facts**

**DSOF ¶1.** Plaintiff Misti Smitley is a female who was hired as a full-time probationary school resource officer ["SRO"] with the Village of Oakwood beginning on or around July 19, 2021. [Defendants' Exhibit C, Deposition of Ronald Soderstrom at p. 72:18-21; Def. Exhibit D, 8 Section 8.2 Employment policy]

---

[2] Plaintiff is not contesting Defendant's Motions for Summary Judgment as to Counts III, V, VII VIII, and IX.

**Response:** Plaintiff was hired as a full-time SRO by the Village of Oakwood and began serving on July 19, 2021, but disputes the assertion that she was on probation, since she was told by both Chief Soderstrom and Mayor McArty at her hiring meeting that she did not have to start probation over since was already a part-time employee and that because she would receive health benefits immediately she would not be on probation [Def. Exhibit B, McArty Dep. at pp. 25:18–26:11, 27:7-12; Def. Exhibit J, Misti Smitley Depo. at pp. 44:22–45:18, 46:12–47:13.]

**DSOF ¶5.** The Board and the Mayor require part-time officers to work two shifts a month to maintain their active commission.  After approximately three to four months of not picking up any shifts, Chief Soderstrom moves officers from an active status to in-active status. Once the officer is placed on in-active status, he or she has to re-apply for employment and the probationary period restarts.  [Def. Exhibit C, Soderstrom Dep., at p. 27:15-19 and at p. 123: 4-8]

**Response:** Plaintiff disputes the assertion that Chief Soderstrom's testimony correctly interprets the Village of Oakwood's policy with respect to retention of part-time police officers. Even if Soderstrom's testimony is correct, Plaintiff understood that she remained a part-time police officer for the Village of Oakwood at the time Chief Soderstrom approached her husband about the SRO position. Plaintiff was given no reason to believe that she was not still a part-time police officer. Chief Soderstrom never notified Plaintiff that she was allegedly inactive.

On March 28, 2021, Plaintiff was told by Chief Soderstrom and Mayor McArty that she did not have to go on probation since was already a part-time employee, and Chief Soderstrom did not go over the Orientation Manual with her, as required for new employees, leaving her December 2019 Orientation Manual as the only one signed by Chief Soderstrom. [Def. Exhibit B, McArty Dep. at pp. 23:3-8, 34:12–35:23; Def. Exhibit C, Soderstrom Dep. at pp. 31:16–32:1, 69:4-18, 70:22–71:13; Def. Exhibit J, Misti Smitley Depo. at pp. 39:3-14, 45:5-18, 46:12–22. A copy of the Village

4

of Oakwood Orientation Manual signed by Plaintiff on July 26, 2021, but not signed by Chief

Soderstrom or Mayor McArty, as required, is attached as Plaintiff's Exhibit 1. (PSOF¶12)

**DSOF ¶6.** Furthermore, pursuant to the Oakwood Police Department Departmental Manual,

"all part-time officers must work a minimum of 100 hours per year to be retained as an Oakwood

Police Officer." [Def. Exhibit D, 8 section 8.2 Employment Policy]

**Response:** Defendant's Exhibit D is correctly quoted, but Plaintiff disputes any implication

that this policy applied to her. Plaintiff affirmatively states that even if Village of Oakwood policy

is correctly stated, that policy was not applied to her for the reasons set forth in Disputed Material

Facts ¶5, *supra.*

**DSOF ¶7.** Mrs. Smitley worked only six shifts after being hired part-time with the Village

of Oakwood, with her last shift being in March 2020. [Def. Exhibit H 5.12 Statement]

**Response:** Plaintiff disputes this allegation and affirmatively states that the statement is not

sworn to under oath and does not refer to documentary support for the statement.

**DSOF ¶8.** Mrs. Smitley was moved to inactive status by Chief Soderstrom in June or July

2020 because her last shift worked as a part-time officer was in March 2020. Because Mrs. Smitley

had not worked any shifts in numerous months, she was not retained as an active part-time Oakwood

police officer. Mrs. Smitley was eligible for re-hire should a position open with the Oakwood Police

Department for which she was qualified. [Def. Exhibit C, Soderstrom Dep, at p. 30: 23- 31:1-6]

and [Def. Exhibit D, 8 Section 8.2 Employment Policy].

**Response:** Plaintiff disputes this allegation and affirmatively states that even if Chief

Soderstrom could point to documentary support for the assertion that Plaintiff last worked as a part-

time officer in March 2020, he did not notify Plaintiff that she was inactive, and treated her as a

part-time employee at the time she was hired as a full-time SRO. [See Disputed Material Facts ¶5,

supra.]

**DSOF ¶9.** In May 2021, Mrs. Smitley inquired about an open position as a School Resource Officer ["SRO"] with the Oakwood Police Department. [Def. Exhibit C, Soderstrom Dep. at p. 57: 16-24]

**Response:** Plaintiff disputes this allegation and affirmatively states that she was not looking for new employment in May 2021. Plaintiff's husband, Kyle Smitley ["Kyle"], had consulted Chief Soderstrom about a boat repair, and Chief Soderstrom told Kyle that Beth Damilano had put in her notice as SRO, and wondered if Plaintiff would be interested in the position. Chief Soderstrom promoted the position as a good fit for Plaintiff, since she would work the day shift, could run the program as she saw fit, and could work her own hours. He told Kyle that he knew Plaintiff made more money and had better benefits in her position with the City of Westville, but offered to sweeten the deal by hiring her on as a sergeant and making her a deputy chief within a year.

Kyle mentioned that health insurance was an issue for Plaintiff, and so Chief Soderstrom gave him the name of the Village's health insurance carrier and its plan. After Kyle and Plaintiff discussed the new position and learned that the Cleveland Clinic was in the network of the Village's health insurance plan [while it was outside the network of the City of Westville plan], Plaintiff contacted Chief Soderstrom about the SRO position in response to this indirect solicitation. [Def. Exhibit C, Soderstrom Dep. at p. 58:11-18; Def. Exhibit G, Kyle Smitley Dep. at pp. 9:23–13:15; Def. Exhibit J, Misti Smitley Depo. at pp. 39:17–40:20.]

**DSOF ¶13.** Immediately following this meeting, Mrs. Smitley accepted the SRO position under the following terms and conditions: a. Hourly pay rate of $20.50; [Def. Exhibit J, Deposition of Misti Smitley, p. 43-44; Def. Exhibit B, McArty Dep. p. 31; Def. Exhibit C, Soderstrom Dep. at p.51: 6-12; Def. Exhibit H 5.12 statement];   b. Hired in at the higher rank of Sergeant [sharing the same rank as her husband] [Def. Exhibit C, Soderstrom Dep. at p.51: 6-12; Def. Exhibit J, Smitley Dep., p. 43:15-22; Def. Exhibit H 5.12 statement];   c. Immediate health insurance coverage –

waiving the 90-day waiting period; [Def. Exhibit C, Soderstrom Dep. at p 124: 3-7; Def. Exhibit J, Smitley Dep., p. 44:7-16; Def. Exhibit H 5.12 statement]; d. 90-day waiting period for life insurance and 365 days/1500 hours for deferred compensation/retirement package. [Def. Exhibit C, Soderstrom Dep. at p. 124: 16-25 and p. 125:1-9]; and   e. 18-month probationary period as applicable to all new hire Oakwood Police Officers.  [Def. Exhibit D, 8 Section 8.2 Employment policy and Def. Exhibit B, McArty Dep. p.at 88:14-17; Def. Exhibit C, Soderstrom Dep., at p. 70:10-21; p. 114:22-23; Def. Exhibit H, 5.12 statement]

**Response:** Plaintiff acknowledges that she agreed to [a] a pay rate of $20.50 per hour, less than the $21 per hour she was earning with the City of Westville; [b] appointment at the rank of sergeant, [c] immediate health coverage and a waiver of the usual 90-day waiting period, but [d] disputes that she agreed to an 18-month probationary period or that she agreed to or even discussed a 90-day waiting period for life insurance and a 365 days/1500 hours compensation/retirement package. Plaintiff disputes the assertion that these were the only offers made to Plaintiff and affirmatively states that Defendants specifically promised Plaintiff that there would be no probationary period, she would be promoted to deputy chief within a few months, she would receive an increase in pay rate when raises were given, and she would have the ability to establish her own schedule. [See Disputed Material Facts ¶5, supra; see also Def. Exhibit C, Soderstrom Dep. at pp. 53:20, 64:7-10; Def. Exhibit J, Misti Smitley Depo. at pp. 40:7-15, 43:6-14; 68:20-25, 72:25–73:23.]

Plaintiff further states that Defendants hired her at the rank of sergeant, but affirmatively states that her husband's rank had nothing to do with the Village of Oakwood's decision to hire her as a sergeant.

**DSOF ¶14.** For new full-time hires, the Oakwood Police Department requires: [1] a health insurance waiting period; and [2] an 18-month probationary period through the Oakwood Police Department. As a term of Mrs. Smitley's new full-time employment, the Mayor agreed to waive the

initial health insurance waiting period because Mrs. Smitley would lose health insurance coverage by resigning her position as a patrol officer at Westville to take the SRO position at Oakwood. Mrs. Smitley was to be enrolled in health insurance immediately upon starting employment with Oakwood.  However, the Mayor did not waive the 18-month probationary period for the new police hire. Therefore, Mrs. Smitley was still subject to the 18-month probationary period as outlined in Oakwood Police Department Manual 8 Section 8.2. [Def. Exhibit D, Section 8.2 Employment Policy; Def. Exhibit H 5.12 statement; 8 Section 8.2 Employment policy]

**Response:** Disputed.   Defendants have stated various and contradictory lengths of the purported probation period. Plaintiff acknowledges that there is a 90-day waiting period for full-time Village of Oakwood employees, including police officers, to quality for health insurance, and agrees that Defendants waived this waiting period for Plaintiff, but disputes the assertion that any other probationary period applicable to police officers was not also waived. Plaintiff further disputes that the 18-month probationary period in Section 8.2 of the Oakwood Police Department Manual was in fact the policy of the Village, since Mayor McArty described three difference probationary periods during her deposition [90 days, 180 days, and 18 months], the Orientation Manual referred to a 90-day probationary period, and the December 13, 2021 letter confirming Plaintiff's termination from employment mentioned a 180-day probationary period [Plaintiff's Exhibit 4, Termination letter on December 13, 2021; PSOF¶15]

**DSOF ¶15.** Neither Chief Soderstrom nor Mayor McArty are medical professionals. The Mayor did not have a deep understanding of Mrs. Smitley's medical condition at the time she was hired as a full-time SRO. Mrs. Smitley advised both the Mayor and Chief Soderstrom that her medical condition was "in remission" at the May 28, 2021 interview. The Mayor interpreted Mrs. Smitley's status as "in remission" to being similar to that of a cancer patient. [Def. Exhibit B, McArty Dep., at p. 17:6-7 and p. 19:12-16; Def. Exhibit C, Soderstrom Dep., at p. 123:14-23].  At

8

this May 28, 2021 meeting, Mrs. Smitley advised the Chief and the Mayor that she would only need an "occasional" doctor's visit here or there. [Def. Exhibit C, Soderstrom Dep., at p. 63:15-20; p. 123]. Completely unbeknownst to both Mayor McArty and Chief Soderstrom, Mrs. Smitley was already undergoing extensive medical treatment, including at the Cleveland Clinic, at this time. [Def. Exhibit L, Deposition of Dr. Bravo at 21:20-24 and at 22:1-15; Def. Exhibit M, Christie Clinic Medical Records CHRISTIE CLINIC 000534-000540; Def. Exhibit N Cleveland Clinic Records, CLEVELAND CLINIC 414-417; Def. Exhibit P Deposition of Dr. Stewart at 23:13-17]

**Response:** Plaintiff agrees that Mayor McArty and Chief Soderstrom are not medical professionals, but disputes that she used the term "remission" to describe her condition. Plaintiff further disputes that the medical evidence submitted by Defendants indicated "extensive medical treatment" that rendered her incapable of performing the duties of her position with or without a reasonable accommodation, since during that treatment and at the time of her hire she had been performing full-time police duties with the City of Westville and part-time duties with the City of Rossville and the Village of Oakwood, she completed SRO training at the beginning of her employment with the Village of Oakwood, and she was able to perform the duties of her position of SRO satisfactorily until she had to take time off for a flare up of her sarcoidosis in November 2021. [Def. Exhibit B, McArty Dep. at pp. 46:23–47:5, 48:16-20; Def. Exhibit C, Soderstrom Dep. at pp. 53:20, 64:7-10, 68:1-6, 81:21-23; Def. Exhibit J, Smitley Dep. at pp. 27:20-22, 39:3-14, 40:17-18, 48:3-20, 89:3-16, 93:1-3]

**DSOF ¶16.** On May 28, 2021 at the interview with the Mayor and Chief Soderstrom, Mrs. Smitley did not request any accommodations pertaining to a more flexible schedule due to her medical condition. [Def. Exhibit C, Soderstrom Dep., at p 63:12-24; Def. Exhibit X – November 24, 2021 Correspondence]. Chief Soderstrom advised Ms. Smitley that she had the authority, within reason, to adjust her own hours based on the needs of the schools. The Chief simply needed to know

9

her hours in advance. [Def. Exhibit C, Soderstrom Dep., at p 66:12-16 and Def. Exhibit G, Deposition of Kyle Smitley at 12:1-4]

**Response:** Plaintiff agrees that she did not use the term "accommodation" in her initial discussions with Chief Soderstrom and Mayor McArty and acknowledges that Chief Soderstrom asked that she tell him in advance of any changes in her schedule, but disputes any implication that flexible scheduling to make medical appointments to make dealing with her sarcoidosis easier was not a feature of the job as presented by Chief Soderstrom when he originally recruited her. [Def. Exhibit B, McArty Dep. at p. 96:1-3; Def. Exhibit C, Soderstrom Dep. at p. 63:12-20; Def. Exhibit G, Kyle Smitley Dep. at pp. 10:14-25, 11:18–12:4; Def. Exhibit J, Smitley Dep. at 49:22-25, 96:12–97:2, 97:12–98:9, 98:22–99:24.]

**DSOF ¶17.** Mrs. Smitley's first day of employment as the SRO was on or about July 19, 2021. She did not return the signed Member Enrollment Form for health insurance benefits to the Village of Oakwood until July 28, 2021. The health insurance enrollment was immediately processed once Mrs. Smitley returned the enrollment form notating the specific healthcare plan of her choosing. She was enrolled in healthcare insurance a month after she started with the Village of Oakwood Police Department. The insurance enrollment was backdated to her first date of employment of July 19, 2021. [Def. Exhibit I, Julie Leverenz at 29:6-8; Def. Exhibit J, Smitley Dep., p 147:2-10].

**Response:** Plaintiff admits that her first day of employment was July 19, 2021 and that after an administrative delay in starting her health insurance she was enrolled and her coverage was backdated to her first day of work, but she disputes the assertion that the fault was due to her failure to return forms on time. Rather, the fault lay with Village Office Manager Julie Leverenz who gave both Plaintiff and Officer Anthony Juvinall—who started full-time at around the same time as

Plaintiff—the wrong forms for enrolling in health insurance.  [Def. Exhibit J, Smitley Dep. at p. 145:3-15; Def. Exhibit K, Juvinall Dep. at pp. 35:20-21, 35:25–36:2, 36:15-23.]

**DSOF ¶18.** Mrs. Smitley allegedly incurred out-of-pocket expenses for one doctor's appointment on July 28, 2021 while her health insurance enrollment was processing.  Per directive from the Mayor, all expenses associated with this visit were to be reimbursed once Mrs. Smitley provided receipts.  To date, Mrs. Smitley has never provided any receipts of the expenses for out-of-pocket expenses associated with this doctor's appointment.  Therefore, the Village of Oakwood has not been able to issue payment.  [Def. Exhibit C, Soderstrom Dep., at p.86:2-17; McArty Dep at p. 86]

**Response:** Mayor McArty and Chief Soderstrom directed that Plaintiff should be reimbursed for all out-of-pocket expenses incurred while her health insurance enrollment was processing, but Plaintiff disputes the assertion that she was reimbursed for a documented credit card payment she made to the Cleveland Clinic. [Def. Exhibit G, Kyle Smitley Dep. at pp. 23:22–24:2, 24:12-17; Def. Exhibit J, Smitley Dep. at pp. 146:11–147:1.]

**DSOF ¶19.** The Oakwood Police Department Departmental Manual includes an employment policy that expressly addresses the probationary period for officers.  Pursuant to the Manual: "All Officers will serve an 18-Month probationary period from the time of appointment, and this will include all part-time as well as full time positions.  Upon completion of this period, the Officer will be evaluated, and his full retention will be based on performance of work duties and reliability."  [Def. Exhibit D 8 Section 8.2 Employment Policy]

**Response:** Plaintiff disputes the assertion that the quoted policy was applicable to Plaintiff. [See Disputed Material Facts ¶14. PSOF¶11-15]

**DSOF ¶20.** When Mrs. Smitley was hired, she was provided and signed a copy of the Oakwood Police Department Manual which outlined the required 18-month probationary period for newly hired officers. [Def. Exhibit C, Soderstrom Dep .at p.34:16-21]

**Response:** Plaintiff disputes the assertion that she signed a copy of the Oakwood Police Department Departmental Manual and affirmatively states that the deposition testimony cited by Defendants for this proposition merely states that Plaintiff signed a paper saying she had reviewed and understood the use of force and pursuit policy. [Def. Exhibit C, Soderstrom Dep .at p.34:13-23]. Defendants have not produced a copy of this document upon Plaintiff's request, and therefore this SOF should be stricken.

**DSOF ¶21.** At the time, raises for Oakwood Police Officers were reviewed in October 2021. [Def. Exhibit B, McArty Dep. at p. 44:14-16].

**Response:** Plaintiff disputes the assertion that raises for police officers were reviewed in October 2021 and affirmatively states that the reference to Def. Exhibit B, McArty Dep. at pp. 44:14-16 does not support that statement. In that excerpt from her deposition, Mayor McArty merely stated that in October 2021 other people in the Village of Oakwood got raises. Mayor McArty did not mention a review.

**DSOF ¶22.** After the Board reviewed the salaries, Mrs. Smitley was not provided a raise in October 2021. [Def. Exhibit B, McArty Dep. at p. 44: 17-18]

**Response:** Plaintiff did not get a raise in October 2021, but affirmatively states that the reference to Def. Exhibit B, McArty Dep. at 44:17-18 does not support the proposition that after the Board reviewed the salaries Plaintiff did not get a raise.  Rather, Mayor McArty simply testified that Plaintiff did not get a raise at that time. Mayor McArty did not mention the Board or a review of salaries.

**DSOF ¶24.** It was determined that Mrs. Smitley was not eligible for a pay raise in October 2021because she had only been working for the Village for just over two months at the time raises were evaluated. [Def. Exhibit B, McArty Dep. at p. at 44: 17-18; Def. Exhibit C, Soderstrom Dep. at p. 82]

**Response:** Plaintiff admits that one of the reasons Mayor McArty gave at her deposition for not giving Plaintiff a raise in October 2021 was that Plaintiff had only been employed with the Village for a few months, but more specifically, Mayor McArty testified that the reason Plaintiff did not get a raise was that she had not been there a year, and that Mayor McArty would revisit the propriety of a raise on Plaintiff's annual review. However, the Mayor pointed to no policy requiring that an officer have been employed for one year to be considered for a raise; Chief Soderstrom testified that the Board usually gave everyone a 3% raise either annually or twice a year; Anthony Juvinall got a raise in October 2021 even though he had not been employed by the Village of Oakwood for a year; and Officer Juvinall testified that he had never heard of someone not getting a raise because they had not been employed long enough. [Def. Exhibit B, McArty Dep. at p. 44:14-21, 53:3-15; Def. Exhibit C, Soderstrom Dep. at p. 41:11-22; Def. Exhibit K, Juvinall Dep. at pp. 16:1-9, 25:3-12, 51:6-10.]

**DSOF ¶25.** It was further determined that Mrs. Smitley would not be eligible for a pay raise in October 2021 because she was hired at a very high initial salary. [Def. Exhibit B, McArty Dep. at p. at 32: 12-17]

**Response:** Plaintiff admits that one of the reasons Mayor McArty gave at her deposition for not giving Plaintiff a raise in October 2021 was that Plaintiff had been hired at a high salary, but disputes the assertion that this is a legitimate justification because Mayor McArty pointed to no Village policy barring raises of employees hired at a high rate of pay.

**DSOF ¶26.** As a part-time officer, Ms. Smitley was earning $17.50 an hour.  After she was re-hired as a full-time SRO, Ms. Smitley was hired at $20.50.  At $20.50 an hour, Ms. Smitley was earning substantially more than other employees, including the Chief of Police, Ron Soderstrom. [Def. Exhibit B, McArty Dep. at p. 45: 3-6; Def. Exhibit W Pay Stubs]

**Response:** Plaintiff disputes the assertion that she was earning "substantially more than other employees." Plaintiff's pay was appropriate to the role of an SRO replacing a former deputy chief working as an SRO. Furthermore, the pay stubs cited as support for the proposition that Plaintiff was making substantially more than other employees document only the pay rate of Plaintiff, not the pay rates of other employees. [Def. Exhibit B, McArty Dep. at pp. 8:24–9:6; Def. Exhibit C, Soderstrom Dep. at p. 53:18-20.] Defendants have failed to produce any documentary evidence that Soderstrom was earning less in income than Plaintiff.

**DSOF ¶31.** The promotion of Mrs. Smitley to Sergeant was mainly symbolic in nature.  Mrs. Smitley would then carry the same rank as her husband, Kyle, who is a Sergeant at the Vermillion County Sheriffs Department. [Def. Exhibit H 5.12 statement]

**Response:** Plaintiff disputes the assertion that her promotion to sergeant was mainly symbolic because Officer Juvinall testified that he reported to Plaintiff as his immediate supervisor. As a sergeant she helped other officers with scheduling and made sure payroll was turned in. [Def. Exhibit K, Juvinall Dep. at pp. 16:1-9, 22:19–23:2; Def. Exhibit J, Smitley Dep. at p. 43:14-17.] Moreover, it is immaterial that Plaintiff's husband Kyle was also a sergeant.

**DSOF ¶34.** At no time did Chief Soderstrom or the Mayor guarantee or promise Mrs. Smitley that she would be promoted to Deputy Chief at the Oakwood Police Department. In fact, Chief Soderstrom never discussed the Deputy Chief position with Mrs. Smitley at all. [Def. Exhibit C, Soderstrom Dep.  at p. 66:17-22, 125: 22-24, Def. Exhibit B, McArty Dep. at p. at 33:7-11 and Def. Exhibit, H 5.12 Statement]

14

**Response:** Plaintiff disputes this allegation and affirmatively states that Chief Soderstrom mentioned making Plaintiff his deputy chief and that when she and Chief Soderstrom were talking back and forth on the phone about the job of SRO he told her he wanted to promote her to deputy chief, but the Mayor wanted to wait until she had served as sergeant and had gotten her raise, which he estimated to be about three months. [Def. Exhibit G, Kyle Smitley Dep. at pp. 12:5-18, 16:19–17:14; Def. Exhibit J, Smitley Dep. at pp. 43:2-14, 68:12–69:5.]

**DSOF ¶35.** In 2021, There were eight total employees at the Oakwood Police Department. This includes only three full-time employees and five part-time employees. [Def. Exhibit C, Soderstrom Dep. at p. 16:13-19]

**Response:** Plaintiff disputes this allegation because it is not supported by the excerpt from Chief Soderstrom's deposition cited by Defendants. That excerpt refers to the make-up of the police department at the time of the deposition, not in 2021.

**DSOF ¶36.** In 2021, the only full-time employees were Police Chief Ronald Soderstrom, Patrol Officer Anthony Juvinall, and School Resource Officer Misti Smitley. [Def. Exhibit C, Soderstrom Dep. at p. 28]

**Response:** Plaintiff disputes this allegation because it is not supported by the excerpt from Chief Soderstrom's deposition cited by Defendants. That excerpt refers to the make-up of the police department at the time at the time Plaintiff was hired as a part-time police officer, not in 2021, and the testimony does not name any of the full-time officers.

**DSOF ¶38.** A patrolman in Oakwood is responsible for investigation of traffic crashes, preliminary investigations of criminal and other offenses, enforcement of criminal and traffic laws, protection of life, rights of others, and property, and general patrol duties. [Def. Exhibit E, Section 7.2 Division Responsibilities].

15

**Response:** Plaintiff disputes this allegation because the tasks listed by Defendant are incomplete. Section 7.2 of the Oakwood Police Department Manual, attached to the motion for summary judgment as Def. Exhibit E, provides a full list of tasks and speaks for itself.

**DSOF ¶40.** Both Chief Soderstrom and Mr. Juvinall received a 3% raise in October 2021, making their pay approximately $19.80 per hour. All Oakwood employees, with the exception of Mrs. Smitley, who was new, received a 3% raise in October 2021. Mr. Juvinall received a raise in October 2021 because he had been employed with Oakwood for over six months by the time raises were evaluated. [Def. Exhibit C, Soderstrom Dep. at p. 22-23]

**Response:** Plaintiff acknowledges that all Village of Oakwood employees except Plaintiff received a 3% raised in October 2021, but disputes the assertion that Officer Juvinall received a raise because he had been employed by the Village for over six months, since Mayor McArty testified that Plaintiff needed to serve for one year before getting a raise. [Def. Exhibit B, McArty Dep. at p. 53:3-15.]

**DSOF ¶41.** Mrs. Smitley admitted that there was no one similarly situated to her at the time as an SRO in Oakwood in 2021. [Def. Exhibit J Smitley Dep., p 84:8-12]. Mrs. Smitley was the only SRO in Oakwood from July 17, 2021, to December 13, 2021. [Def. Exhibit J Smitley Dep., p 56:25 and p.57:1-5]

**Response:** Plaintiff admits that she was the only SRO employed by the Village of Oakwood from July through November 2021, but disputes the assertion that she was not similarly situated to other employees of the Village of Oakwood, including other police officers, for purposes of raises because in October 2021 a 3% raise was given across the board to all employees, except Plaintiff [Def. Exhibit C, Soderstrom Dep. at p. 22:19-24.]

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

**DSOF ¶48.** On May 28, 2021, Mrs. Smitley interviewed for the SRO position at Oakwood Police Department with Chief Soderstrom and the Mayor. At this time, she advised her condition was "in remission." [Def. Exhibit B, Deposition of Heather Mcarty at 19:12-16]

**Response:** Plaintiff admits that she interviewed for the SRO position on May 28, 2021, but disputes the assertion that she used the term "remission" to Chief Soderstrom and Mayor McArty, and even if she had, Plaintiff is not a medical expert who is qualified to provide a medical opinion.

████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████



**DSOF ¶55.** On November 5, 2021, the school in which Mrs. Smitley was assigned was out on remote learning due to COVID-19.  An accommodation was provided allowing for Mrs. Smitley to work from home for these three days. [Def. Exhibit R, Text Messages #1 and Def. Exhibit H 5.12 statement]

**Response:** Plaintiff admits that on November 3, 2021 she texted Chief Soderstrom that because her doctor had told her she should not drive she was working remotely, working on an anti-bully project for the school and SRO program and emailing back and forth with teachers on welfare issues, and that Chief Soderstrom responded that he would show her on SRO duty for the week, but dispute Defendants' characterization of the Chief's response as an accommodation, since the school where she worked was out on remote learning. [Def. Exhibit R, Text Messages #1.]



**DSOF ¶64.** The Mayor was aware that Mrs. Smitley was treated at the Cleveland Clinic. She was concerned about Mrs. Smitley's well-being as she had not updated Chief Soderstrom as to when they could expect her back to work, her status, or if she was cleared to return without restrictions [Def. Exhibit B, Deposition Transcript of Heather Mcarty at 57:17-25 and at 58:1-4 ].

**Response:** Plaintiff disputes that Mayor McArty testified that she was concerned about Plaintiff's well-being, since the deposition excerpt referred to by Defendants merely states that she learned that Plaintiff had gone to the Cleveland Clinic and discussed with Chief Soderstrom when she would return. [Def. Exhibit B, McArty Dep. at pp. 57:17–58:4.]

**DSOF ¶65.** The Mayor asked Chief Soderstrom to draft a brief memorandum to Mrs. Smitley on November 18, 2021 to advise Mrs. Smitley of her remaining compensatory time and sick days as she had missed a significant amount of time from work.  [Def. Exhibit B, Deposition

Transcript of Heather McArty at 60:7-9] This memorandum dated November 18, 2021 was not a termination notice but rather just an update as to her remaining leave benefits. [Def. Exhibit B, Deposition Transcript of Heather McArty at 62:18-25 and 63:1-5 and Def. Exhibit, U, 11/18 Memorandum]

**Response:** Plaintiff disputes that the November 18, 2021 memorandum from Chief Soderstrom to Plaintiff was not a termination letter, but just an update on Plaintiff's remaining leave benefits, because the memorandum stated that Plaintiff would be off without pay and advised her, "If a Terminated employee wishes to resume employment with the Village, they must re-apply and if rehired be considered as a new employee." [Def. Exhibit U, November 18, 2021 Memorandum from Chief Soderstrom to Plaintiff]

**DSOF ¶66.** On November 19, 2021, Mrs. Smitley returned to work unannounced and unexpected.  She was wearing her uniform and proceeded to take the patrol car and report to the grade school. Neither the Mayor nor Chief Soderstrom were at Village Hall when Mrs. Smitley returned.  [Def. Exhibit B, Deposition Transcript of Heather Mcarty at 65:4-25]

**Response:** Plaintiff admits that she returned to work on November 19, 2021, but disputes that her return was "unannounced and unexpected," since she had texted Chief Soderstrom on November 12, 2021 that her symptoms were improving and that if all went as planned her doctor would release her to return to work. [Def. Exhibit T, Text Messages #2.]

**DSOF ¶67.** After being asked for a photograph of a medical note from her provider with no restrictions, Mrs. Smitley advised the Mayor that she did not have the medical note with her but rather it was located in her vehicle at the Police Department. [Def. Exhibit B, Deposition Transcript of Heather McArty at 65:4-25]

**Response:** Plaintiff had previously provided Chief Soderstrom with a copy of the medical note with no restrictions prior to speaking to the Mayor.

**DSOF ¶68.** In the early afternoon of November 19, 2021, the Mayor called Mrs. Smitley to discuss her return to work. Mrs. Smitley advised that she was still having issues with her leg. The Mayor heard that Mrs. Smitley was slurring her speech over the phone. [Def. Exhibit B, Deposition Transcript of Heather McArty at 65:4-25, at 66:22-25 and at 67:1-13.] The Mayor asked Mrs. Smitley if she had a medical note from her physician showing that she has no restrictions. Originally, Mrs. Smitley advised that she did have a note.  The Mayor asked Mrs. Smitley to email it, text it, or drive it to her in person. [Def. Exhibit B, Deposition Transcript of Heather Mcarty at 65:4-25 and at 75:1-11]

**Response:** Plaintiff admits that she discussed her return to work with Mayor McArty, but disputes the implication that she was not fit for duty, since Mayor McArty testified that she was not concerned about Plaintiff's ability to work, but she wanted a return-to-work letter because Plaintiff had missed several days and Chief Soderstrom asked for a note, and limping and stuttering do not make a police officer unfit for duty.  [Def. Exhibit B, McArty Dep. at p. 67:9-25; Def. Exhibit J, Smitley Dep. at p. 134:20-23; Def. Exhibit K, Juvinall, Dep. at p. 64:13-19.]

**DSOF ¶70.** The Mayor advised Mrs. Smitley to leave the grade school immediately.  The Mayor needed to review the medical note before Mrs. Smitley was able to resume her working activities. The Mayor advised Mrs. Smitley that she was not permitted to work if she was not medically cleared to do so. [Def. Exhibit B, McArty Dep. at p. 65:24-25; p. 66 at 1-6; p. 68:1-8 and at 70:6-12]

**Response:** Mayor McArty instructed Plaintiff to leave the grade school in order to retrieve the return-to-work note, but disputes the assertion that the Mayor was concerned that Plaintiff was not medically cleared to return to work because the deposition excerpts cited by Defendants do not contain the word "medical," and Mayor McArty testified that she was not concerned about

23

Plaintiff's ability to work, but only wanted the letter because Plaintiff had missed several days and Chief Soderstrom had asked for a note. [Def. Exhibit B, McArty Dep. at p. 67:9-25.]

**DSOF ¶71:** After leaving the grade school, Mrs. Smitley clocked out with the County. She never advised the Mayor or Chief Soderstrom that she was not returning to work. [Def. Exhibit B, McArty Dep. at p. 66: 7-11, and at p. 70:6-12]

**Response:** Plaintiff disputes that she never advised Mayor McArty or Chief Soderstrom that she was not returning to work because it was unnecessary in that Mayor McArty had directed her to clock out and Plaintiff interpreted the memorandum from Chief Soderstrom to mean that she was fired. [Def. Exhibit B, McArty Dep. at p.70:10-12; Def. Exhibit J, Smitley Dep. at p. 136:9-14; Def. Exhibit U, November 18, 2021 Memorandum from Chief Soderstrom to Plaintiff.]

**DSOF ¶72.** After retaining legal counsel, Mrs. Smitley, through her counsel sent written correspondence to the Mayor dated November 24, 2021. This letter attached a medical note signed by Dr. Stewart at the Christie Clinic on November 18, 2021. This was the first time that the Mayor received any type of medical documentation from Mrs. Smitley. Identical to the first return to work note, this note did not provide an unrestricted medical clearance. Rather, it only excused Mrs. Smitley from work from November 8, 2021 through November 18, 2021. Furthermore, this written letter from counsel concedes that Mrs. Smitley did not request any type of reasonable accommodation. [Def. Exhibit B, McArty Dep. at p 93:7-22 and at 94:11-16; Def. Exhibit S, November 18, 2021 Note; Def. Exhibit X – November 24, 2021 Correspondence]

**Response:** Plaintiff disputes that the November 18, 2021 return-to-work note did not satisfy Chief Soderstrom's request for a doctor's note clearing her for unrestricted duty because the doctor's note listed no restrictions, and Dr. Stewart testified that if she had had concerns about Plaintiff returning to work, she would not have hesitated to include them in the letter because she does not normally write these kind of letters if a patient is too sick to return to work.

24

Moreover, Plaintiff disputes the implication that the lack of a request for a reasonable accommodation somehow gives Defendants an enhanced right to dictate the terms of her return to work following sick leave [Def. Exhibit P, Stewart Dep. at pp. 41:15-21, 44:7-10; Def. Exhibit S at p. 2, November 18, 2021 return-to-work letter; Def. Exhibit T, Text Messages #2.]

**DSOF ¶73.** Dr. Stewart testified that Mrs. Smitley requested a work excuse letter. The November 18, 2021 note signed by Dr. Stewart is just a general letter that does not address work restrictions.  The work excuse signed by Dr. Stewart does not address restrictions as to what Mrs. Smitley can or can't do at work [Def. Exhibit P, Deposition Transcript of Dr. Stewart at 39:19-23]

**Response:** Plaintiff acknowledges that Dr. Stewart's letter dated November 18, 2021 does not address work restrictions, but Dr. Stewart testified that if she had had concerns about Plaintiff returning to work, she would not have hesitated to include them in the letter.  She does not normally write these kind of letters if a patient is too sick to return to work. [Def. Exhibit P, Stewart Dep. at pp. 41:15-21, 44:7-10.]

**DSOF ¶75.** Dr. Stewart testified that at the November 15, 2021 appointment, Mrs. Smitley was actively being treated by several specialists and she was still sick. [Def. Exhibit P, Deposition Transcript of Dr. Stewart at 35:1-4] She had vision loss, left-sided sensory deficit, left-sided weakness, vision disturbances, electric shock, and inability to walk.  With all of those symptoms present, Mrs. Smitley could barely function let alone return to any form of employment, especially that of a police officer. [Def. Exhibit P, Deposition Transcript of Dr. Stewart at 35:6-12 at 49:20-22 and at 50: 4-8]

**Response:** Plaintiff acknowledges that at her deposition Dr. Stewart expressed the opinion that Plaintiff was not able to turn to work on November 20, 2021. However, Dr. Stewart conceded that she did not have a job description for Plaintiff and that there was nothing in the Plaintiff's medical records at the Christie Clinic saying that Plaintiff could not perform the duties of her job.

25

[Def. Exhibit P, Stewart Dep. at pp. 34:6-9 and 48:12-19.]  Moreover, Dr. Stewart testified that she would not have issued a return-to-work letter if she believed Plaintiff was too sick to work. [See infra ¶73.]

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████

**DSOF ¶78.** Mrs. Smitley did not return to work after November 19, 2021. [Def. Exhibit O Timecards; Def. Exhibit B, McArty Dep. at p. 94:5-10; Def. Exhibit C, Soderstrom Dep., at p. 106] Mrs. Smitley did not communicate with either the Mayor or Chief Soderstrom following November 19, 2021. [Def. Exhibit B, Deposition Transcript of Heather Mcarty at 94:5-7; Def. Exhibit C, Soderstrom Dep., at p. 106]

**Response:** Plaintiff disputes the assertion that she chose not to return to work after November 19, 2021, and that she did not communicate with Mayor McArty or Chief Soderstrom after that date. Plaintiff had communicated continuously through her attorney with the Village from November 24, 2021 until the date of her termination on December 13, 2021. [Def. Exhibit J, Smitley Dep. at p. 136:9-14; Def. Exhibit U, November 18, 2021 Memorandum from Chief Soderstrom to Plaintiff; Def. Exhibit X, November 24, 2021 Letter from Ronald S. Langacker to Mayor Heather McArty, PSOF¶13-15]

**DSOF ¶79:** Village of Oakwood Employee Handbook Policy provides for that following pertaining to job abandonment:

> Employees must obtain affirmative confirmation of approved time away from work. An unexcused absence for a full workday will be considered job abandonment. The Village of Oakwood may consider this an unannounced voluntary separation of employment by the employee. If such a decision is made, the Village of Oakwood will promptly suspend all pay and benefits and take similar action in the same manner as if the separation were announced. All rights for continued benefit coverage under applicable law will be extended except for any benefit premium subsidized by the Village of Oakwood. Employees that separate employment with the Village of Oakwood under the definition of job abandonment are not eligible for rehire for a period of 5 years.

**Response:** Plaintiff disputes this as the document cited by Defendants [Defendant's Def. Exhibit Z] is a copy of a draft of an employment handbook dated August 29, 2021. The Village did not have or enact an employee handbook until later in 2021, when the matter was discussed with the Village Board of Trustees. [PSOF¶17].

**DSOF ¶80.** Pursuant to the Village of Oakwood Employee Handbook and Village of Oakwood Ordinance 45-15-A-8, Mrs. Smitley had been absent from work for greater than five days. In fact, Mrs. Smitley was absent from work without contact or communication for twenty-four days from November 19, 2021 to December 13, 2021.  Mrs. Smitley started using her unpaid leave days on November 23, 2021.  Mrs. Smitley remained on unpaid leave from November 23, 2021 until her date of termination on December 13, 2021. [Def. Exhibit V Notice of Separation Letter; Def. Exhibit Q, Memorandum and Timecards]

**Response:** Plaintiff disputes that she was voluntarily absent from work during this period from November 19, 2021 to December 13, 2021 because while the Plaintiff attempted to return to work on November 19, 2021 she was told to clock out by Mayor McArty.  [Def. Exhibit B, McArty Dep. at p.70:10-12; Def. Exhibit J, Smitley Dep. at p. 136:9-14; Def. Exhibit U, November 18, 2021 Memorandum from Chief Soderstrom to Plaintiff; PSOF¶13-15.]

**DSOF ¶81.** Therefore, as of December 13, 2021, Mrs. Smitley was terminated from the Oakwood Police Department for job abandonment. [Def. Exhibit V, Notice of Separation Letter and Def. Exhibit B, Deposition Transcript of Heather Mcarty at 94:20-25]

**Response:** Plaintiff states that the purported reason for which the Village terminated her was for "job abandonment;" however, Plaintiff states the reason provided by Defendants was not a legitimate reason for termination, and/or pretextual in nature.

28

**C.    Disputed Immaterial Facts**

Plaintiff contends that there are no assertions in the Undisputed Material Facts in Defendants' Motion for Summary Judgment that are both immaterial and disputed.

**D.    Undisputed Immaterial Facts**

Plaintiff contends that the following numbered assertions of Undisputed Material Facts in Defendant's Motion for Summary Judgment are undisputed but immaterial:

**DSOF ¶30.** Despite no experience as an SRO, Chief Soderstrom and the Mayor agreed to promote Mrs. Smitley to Sergeant upon hiring her full-time as the School Resource Officer. Being hired as a Sergeant was an increase in rank. She had never been a sergeant anywhere prior to that. [Def. Exhibit J, Smitley Dep. at p. 43:15-22]

**Response:** Plaintiff admits that she had never served as a sergeant or an SRO prior to being hired by the Village of Oakwood, but affirmatively states that prior experience as an SRO was not necessary to being hired as an SRO, since training was available, and the Village felt she was qualified for the position. [Def. Exhibit C, Soderstrom Dep. at p. 81:21-23; Def. Exhibit J, Smitley Dep. at pp. 48:3-4.]

**DSOF ¶32.** Anthony Juvinall, a patrol officer at Oakwood Police Department did not recall any conversations about Mrs. Smitley being promoted to Deputy Chief. [Def. Exhibit K, Deposition of Anthony Juvinall at 49:25-50:1-4]

**Response:** It is immaterial that Officer Juvinall testified that he did not remember any discussions about promoting Plaintiff to Deputy Chief, since he was a recently hired full-time patrol officer who reported to Plaintiff because she was his immediate supervisor and he would not have had a role in hiring, firing, or promoting, which rested with Mayor McArty and Chief Soderstrom. [Def. Exhibit K, Juvinall Dep. at pp. 16:1-9, 22:19–23:2.]

29

**DSOF ¶43.** On March 22, 2021, Mrs. Smitley was re-evaluated by her primary care physician, Dr. Stewart and her symptoms had not improved.  Mrs. Smitley advised that she had an upcoming appointment with a sarcoidosis specialist.  She states that she had debilitating fatigue and can barely function throughout the day.  [Def. Exhibit P, Deposition of Dr. Stewart at 22:17-22].

**Response:** Outside of the fact that DSOF confirms that Plaintiff suffered from a disability, Plaintiff's condition prior to her becoming employed with the Village of Oakwood is immaterial as to how her disability impacted her condition during her employment, and/or her ability to perform her job with or without an accommodation.

**DSOF ¶82.** Mrs. Smitley returned to Dr. Bravo on December 29, 2021.  At that time, she was still sick. [Def. Exhibit, P Deposition of Dr. Stewart at 49:20-22]

**Response:** Plaintiff disputes that she returned to see Dr. Bravo on December 29, 2021 because the evidence cited by Defendant shows that she returned to see Dr. Stewart that day, not Dr. Bravo. While Dr. Stewart testified that Plaintiff was "still sick" on that date, Dr. Stewart documented no evidence to support that conclusion, and Defendants did not attach medical records from that visit as an Def. Exhibit. [Def. Exhibit P, Stewart Dep. at pp. 36:23–37:1.] Moreover, Plaintiff had already been terminated prior to this time, and any such fact, assuming it to be accurate, is not material.

E.     **Additional Material Facts**

**PSOF ¶1.** Defendants hired Plaintiff as a full-time SRO with the full knowledge that she suffered from sarcoidosis in part due to a news story regarding her disability on the local CBS affiliate in May 2021 and a community benefit organized to raise money for Plaintiff's out-of-network medical costs and travel expenses, to which both the Village of Oakwood and Mayor McArty personally contributed. [Def. Exhibit B, McArty Dep. at pp. 16:19–17:5, 17:19–19:4; Def.

Exhibit C, Soderstrom Dep. at p. 61:16–52:10; Def. Exhibit G, Kyle Smitley Dep. at pp. 10:14-19, 14:17–15:7.]

PSOF ¶2. At the time that Chief Soderstrom recruited Plaintiff to serve as SRO for the Village of Oakwood through the start of Plaintiff's employment with the Village, Plaintiff was employed full-time as a patrol officer for the City of Westville and worked part-time for the Village of Oakwood and the City of Rossville.  [Def. Exhibit C, Soderstrom Dep. at pp. 53:20, 64:7-10, 68:1-6; Def. Exhibit J, Smitley Dep. at p. 27:20-22, 39:3-14.]

PSOF ¶3. After texting Plaintiff on November 3, 2021 that he would need a note from her doctor when she was ready to return to full duty, especially given vision issues Plaintiff was experiencing, Chief Soderstrom accepted a return-to-work from Dr. Stewart dated November 3, 2021, which had no restrictions. [Def. Exhibit Q, November 30, 2021 Memorandum from Chief Soderstrom to Mayor McArty; Def. Exhibit R, Texts between Chief Soderstrom and Plaintiff, November 3, 2021; Def. Exhibit S at p. 1, November 3, 2021 return-to-work letter.]

PSOF ¶4. Following a Facebook post by Plaintiff after her November 9-12 hospitalization at the Cleveland Clinic, Chief Soderstrom inferred from social media that Plaintiff was not fit for duty and he assumed she would not return to work because she had been out since November 3. [Def. Exhibit C, Soderstrom Dep. at pp. 100:14–101:4, 106:10-22; Def. Exhibit K, Juvinall Dep. 56:9-21, 57:9–58:1.]

PSOF ¶5. According to time sheets Defendants kept on Plaintiff, from the time she started work in July 2021 through her termination, she took six sick days on September 24, November 12, November 15, November 16, November 17, and November 18.  [Def. Exhibit O, Timecards.]

PSOF ¶6. When she returned to work on November 19, 2021, Plaintiff placed the return-to-work letter in Chief Soderstrom's intake box at the Police Department. Plaintiff advised the Mayor that she had placed a copy of the return-to-work letter in Chief Soderstrom's box, after which the

Mayor asked Julie Leverenz, the office administrator, to take the letter out of the Chief's box and take a picture of it. [Def. Exhibit J, Smitley Dep at p. 131: 12-18] The return-to-work letter was no longer in the Chief's box at the Police Department. [Def. Exhibit J, Smitley Dep. at p. 135:21–136:4.]

PSOF ¶7. Defendants did not ask that Plaintiff undergo a fitness for duty examination before returning to work on November 19, 2021. [Def. Exhibit B, McArty Dep. at p. 68:19-25.]

PSOF ¶8. Anthony Juvinall would oftentimes see Plaintiff in 2021 working at the end of her shift at the time his shift would start. He testified that he a) never saw Plaintiff having trouble getting into her vehicle; b) never had trouble walking, c) never had any trouble with her vision; d) never had any difficultly speaking.  [Def. Exhibit K, Juvinall Dep. At pgs. 63:11-25; 64 1-19].  Officer Juvinall testified that during the times he worked with Plaintiff, there was nothing that gave him concern about her ability to perform her job. [Def. Exhibit K, Juvinall Dep. at p. 64: 20-23].

PSOF¶9. Troy Hogan began to work as the SRO after the Plaintiff was terminated.  Officer Hogan earned $33.65 per hour.

PSOF¶10. During her deposition Heather McArty testified that there was a 90-day probationary period involving police officers [Def. Exhibit B, McArty Dep. at p. 26:1-11.]  McArty also testified that the Plaintiff had waived the probationary period for her employment, [Def. Exhibit B, McArty Dep. at p. 25:21-23.] and also stated that she had passed her probationary period with the police. [Def. Exhibit B, McArty Dep. at p. 27:17-12.]

PSOF¶11. When Plaintiff commenced her employed as a part-time police officer, on December 17, 2019 she was presented an "Employee Orientation Manual" which was signed by herself and Chief Soderstrom. The Manual [which states on the first page that the Plaintiff was being hired part-time] states on page 3, in large font: "All employees are hired on a 90-day probationary period." [Plaintiff's Exhibit 2 - 2019 Employee Orientation Manual]

32

**PSOF¶12.** On July 19, 2021, Plaintiff was provided a second "Employee Orientation Manual" which again states in large font on the third page: "All employees are hired on a 90-day probationary period." [Plaintiff's Exhibit 1 - 2021 Employee Orientation Manual] Plaintiff signed the Employee Orientation Manual.

**PSOF¶13.** On November 24, 2021, five days after Plaintiff was advised to not return to work, Plaintiff's attorney drafted a letter to the Mayor inquiring about Plaintiff's status. [Def. Exhibit Y]. Plaintiff's attorney's correspondence references the physician's note presented to the Mayor on November 19, 2021. Plaintiff's counsel requested the Mayor provide the rationale for allegedly failing to accept the physician's note.

**PSOF¶14.** On December 6, 2021, Plaintiff's attorney provided a copy of the release provided by Plaintiff's physician on November 18, 2021 [Plaintiff's Exhibit 3]

**PSOF¶15.** On December 13, 2021, Plaintiff's attorney received correspondence from the Mayor stating that she had been terminated for job abandonment. The correspondence makes the following assertions:

a) Plaintiff had not returned to work since November 30, 2021, with the exception of returning to work on November 19, 2021;

b) Plaintiff did not provide the Village with a copy of the physician's note on November 19, 2021;

c) While acknowledging receiving the Physician's note on December 6, 2021 from Plaintiff's attorney, the Mayor said the note was insufficient and did not address the concerns of the Village;

d) The alleged conduct occurred "during your shortened 180 day probation period" which did not expire until January 18, 2022.

[Plaintiff's Exhibit 4 - Termination letter on December 13, 2021].

33

**PSOF¶16.** During the time period that Plaintiff was employed, she was performing her job well, and had not been disciplined by the Chief for any reason, and the Village had not received any citizen complaints about her conduct [Def. Exhibit B, McArty Dep. at p. 48:12-22]. There was also no issue with the Plaintiff taking any time off until November of 2021. [Def. Exhibit B, McArty Dep. at p. 48: 23-25, 49:1.]

**PSOF¶17.** Prior to 2021, the Village did not have an employee handbook for all employees, and upon becoming Mayor Ms. McArty began drafting a handbook. [Def. Exhibit B, McArty Dep. at p. 91:22-25; p.92, 1-13] The Handbook was first provided to the Village Board of Trustees on December 13, 2021. [Plaintiff's Exhibit 5]. Plaintiff did not sign a copy of the new handbook [Def. Exhibit B, McArty Dep. at p. 92:17-24].

## STANDARD OF REVIEW

Summary judgment is appropriate only where the evidence shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The nonmoving party must then "come forward with specific facts showing that there is a genuine issue for trial." *LaRiviere v. Bd. of Trs. of S. Ill. Univ.*, 926 F.3d 356, 359 (7th Cir. 2019). The nonmoving party must establish "that a reasonable jury could return a verdict in [his] favor." *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012); see also *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("[S]ummary judgment will not lie… if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."). In deciding a motion for summary judgment, a "court …must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." *McCottrell v. White*, 933 F.3d 651, 657–58

(7th Cir. 2019); see also *Anderson*, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").

## ARGUMENT

The sole question in a disability discrimination case is whether a reasonable juror could conclude that the plaintiff would have kept his or her job if her or she were not disabled. *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 764 (7th Cir. 2016). *Aberman v. Bd. of Educ. of City of Chicago*, 242 F. Supp. 3d 672, 686–87 (N.D. Ill. 2017) (applying Ortiz to ADA claims). In other words, a plaintiff is entitled to a jury trial if the evidence would permit a reasonable factfinder to conclude that the plaintiff's disability caused his employer to take the adverse employment action they did. *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

Defendants frame many of their arguments for Summary Judgment under the McDonnel-Douglas framework, alleging: (1) Plaintiff was not meeting Defendants' legitimate expectations, (2) Plaintiff failed to identify any similarly situated non-disabled employees who were treated more favorably, and (3) Plaintiff failed to establish pretext. However, Plaintiff is not required to utilize the McDonald Douglas framework and instead relies on the Ortiz framework. See *Igasaki*, 988 F.3d 948 at 957-58 ("a plaintiff need not use the McDonell-Douglas framework after Ortiz."). Under *Ortiz*, this Court's inquiry is "simply whether the evidence would permit a reasonable factfinder to conclude that [Plaintiff's] ... [disability] caused the ... adverse employment action." *Ortiz*, 834 F.3d at 765. Here, Plaintiff similarly proceeds under the Ortiz framework, and not the McDonnell-Douglas framework. In making this determination, "all evidence belongs in a single pile and must be evaluated as a whole." *Ortiz,* 834 F.3d at 766. Thus, this Court should ask whether a reasonable juror could conclude that Plaintiff would have kept her job if she did not have a disability, and "everything else had remained the same." *Id*. at 766.

A. **Plaintiff Can Establish Disability Discrimination under the ADA and/or IHRA as to Count I.**

1. **Plaintiff is a Qualified Individual as Defined by the ADA.**

The ADA prohibits employers from discriminating against a "qualified individual on the basis of disability." 42 U.S.C. § 12112(a). A threshold question for these ADA claims is whether the plaintiff is a "qualified individual with a disability" and thus protected by the ADA. *Id.* The ADA defines "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Pursuant to the ADA, a plaintiff is qualified to perform her job if she has the skill, experience, education and other requirements needed for the job, and could perform its essential functions either with or without a reasonable accommodation. *McAllister v. Innovation Ventures*, LLC, 983 F.3d 963, 971 (7th Cir. 2020) (quoting 42 U.S.C. § 12111(8)).

Defendants spend a considerable amount of time arguing that Plaintiff was not a "qualified individual" with a disability. Defendants' argument is that Plaintiff was not a qualified individual because from November 19, 2021, until December 13, 2021, she had "abandoned" her job. That is simply factually incorrect. There is no basis in the record that Plaintiff had any attendance issues during her time of employment. It was only when she took time off due to a flare-up of her disability that she was told that she had exhausted her leave time and would be placed on unpaid leave as of November 22, 2021. Almost immediately afterward, Plaintiff's attorney contacted the Village to inquire why they were not accepting the physician's note that Plaintiff provided on November 19 when Mayor McArty sent her home. Quite frankly, Plaintiff cannot be discharged for "job abandonment" when the Village refused to allow her to return to work, and refused to accept her physician's note which stated, unequivocally, that Plaintiff could return to work as of November 19, 2021.

36

While the Village disputes whether Plaintiff provided the physician's note on November 19, there is no question that the Village had received the physician's note on December 6, 2021, at the latest. Time sheets maintained by Defendants showed that Plaintiff took six sick days during her five months of employment, five of which occurred during her sarcoidosis flare-up in early November of 2021, just prior to her termination. (PSOF ¶5.) Even if this number of sick days had exceeded the number allotted to Plaintiff, the length of Plaintiff's absence pales in comparison with the time missed by plaintiffs in cases cited by Defendants in which the courts found that the employee was not a qualified individual with a disability due to excessive absences. In *Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476 (7th Cir. 2017), cert. denied, 584 U.S. 916 (2018), the plaintiff sought—and was denied— an additional two to three months off to address a medical problem after having exhausted his 12 weeks of Family and Medical Leave Act leave. In *Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034 (7th Cir. 2013), the employee was terminated from her job as a dispatcher after less than one year on the job after seven "incidents" of absenteeism, where an absence of up to five shifts for a single reason was treated as a single incident.  In *Jovanovic v. In-Sink-Erator*, 201 F.3d 894 (7th Cir. 2000) the employee was terminated after receiving seven warnings over the course of seven and one-half years that he was "excessively absent," which the employer defined as "absent at a rate one full percentage point greater than the plant absentee average, provided that such absence rate exceeded seven days in a twelve-month period."  201 F.3d at 895.

By contrast, Plaintiff did not have multiple episodes of absences. In fact, she didn't have any unexcused absences until November 19, when she was placed on leave. Even assuming the absence in November (for which she had sufficient leave time) violated a policy of the employer (which isn't being argued), that absence was only for a few days. Defendants have pointed to nothing in any policy manual that would explain the consequences of taking a few extra days of sick leave.

Finally, Defendants have not established that Plaintiff abandoned her job, since the alleged abandonment occurred after Chief Soderstrom issued his November 18, 2021 letter, which Plaintiff construed to be a termination letter. Accordingly, Defendants have not shown as a matter of law that Plaintiff was not a qualified individual with a disability due to her absence from work in November 2021.

2. **Plaintiff Could Perform the Essential Elements of Her Position**.

████████████████████████████████████████████

███████████████████████████████

Contrary to Defendants' litigating position that Plaintiff was not fit for duty, Mayor McArty testified that she was not concerned about Plaintiff's ability to work and only demanded the return-to-work letter because Plaintiff had missed several days of work and Chief Soderstrom had asked her for a doctor's note. (DSOF ¶68.) Defendants next insist that Plaintiff's provided doctor's note did not state that Plaintiff could perform her job without restrictions. However, the note clearly contained no specific restrictions, and by Dr. Stewart's own testimony, she would have included restrictions if necessary. (DSOF ¶72, 73, 75, 76.) Again, there was no request from Defendants that Plaintiff clarify her physician's note or seek further medical information to determine whether she was fit for duty. The Village simply rejected Plaintiff physician's note categorically and terminated her. *Bultemeyer v. Fort Wayne Community Schools*, 100 F.3d 1281 (7th Cir. 1996) is instructive here. In that case, the plaintiff, after a period of leave, provided the employer with a physician's note saying he may want to be transferred to a less stressful position. Without considering the note, the employer terminated the plaintiff because he had failed to report to work.  *Id.* at 1282. The Court ruled that the employer failed to engage in the interactive process with the plaintiff after receiving his physician's note. *Id.* at 1284.  Further, as the *Bultemeyer* decision states in detail, the interactive process requires that "both parties bear responsibility for determining what accommodation is necessary." *Id.* at 1285.

There is also a material issue of fact whether Plaintiff was on probation, and how long the purported period of probation would be. At various times in the record,  Defendants have stated a) Plaintiff was on probation for 90 days from the time her part-time employment commenced on December 17, 2019 (PSOF¶11); b) Plaintiff was on probation for 90 days after starting her full time employment on July 19, 2021 (PSOF¶12); (c) Plaintiff was on probation for 180 days (PSOF¶15);

(d) Plaintiff was on probation for 18 months (DSOF ¶13-14); and (e) Plaintiff was not on probation. (PSOF¶10). Considering that one of the alleged reasons Plaintiff was terminated was because she was still on probation, this is undoubtedly a material fact where the evidence is troublingly inconsistent, at best.

In the absence of undisputed evidence that Plaintiff was on probation—whether it was for 90 days, 180 days, 18 months, or some other period—or of undisputed evidence that the attendance policies cited by Defendants applied to Plaintiff despite of the promises made to her when she was hired (DSOF ¶1, 5, 6, 13, 14), Defendants have not shown that Plaintiff failed to fulfill an essential function of her position as SRO by meeting attendance requirements. Even if Defendants could show that Plaintiff had missed work in violation of the attendance policies, they cannot show that her absences were excessive because they contend that she started using unpaid leave on November 23, 2021 and used her fifth day of unpaid leave on November 29, 2021, but Chief Soderstrom left her a termination letter on November 18, 2021, before she allegedly used and exceeded her unpaid leave time. (DSOF ¶65, 78, 80, 81.)

In this case, Plaintiff presented a physician's note stating she could return to work on November 19, 2021. Defendants give no explanation for why they found the November 19, 2021 return-to-work note insufficient, leaving open the possibility that, in spite of their admitted lack of medical training, Defendants engaged in their own diagnosis and concluded, without reference to any evidence other than what Plaintiff posted on Facebook, that she was unable to perform the essential duties of her job. (PSOF ¶4.)

Defendants presumption that Plaintiff could not perform her job while suffering from sarcoidosis was completely unfounded, given that Plaintiff was working full-time for the City of Westville with a diagnosis of sarcoidosis prior to her hire by Defendants (PSOF ¶2), she performed her job as SRO satisfactorily during her employment with the Village of Oakwood (DSOF ¶15), she

40

was able to perform her SRO duties during a flare-up of her condition a week prior to her trip to the Cleveland Clinic (DSOF ¶55), and Plaintiff literally was able to return to work on November 19 (DSOF ¶66).

Further, to escape liability for taking action against a disabled employee because of his disability, it is the employer who bears the burden of proving that it took the action because the employee was a "direct threat" to workplace safety. *Pontinen v. United States Steel Corp.*, 26 F.4th 401, 406 (7th Cir. 2022); *Branham v. Snow*, 392 F.3d 896, 906 (7th Cir. 2004)("it is the employer's burden to show that an employee posed a direct threat to workplace safety that could not be eliminated by a reasonable accommodation."). The determination that an employee poses a direct threat to his own health and  safety or that of others must be premised upon "a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence, and upon an expressly individualized assessment of the individual's present ability to safely perform the essential functions of the job." *Darnell v. Thermafiber, Inc.*, 417 F.3d 657, 660 (7th Cir. 2005) (employer told employee it was rescinding his offer because he had not passed the physical performed by a doctor).

### 3.   Defendants' Reasons for Plaintiff's Termination were Pretextual.

As Plaintiff is proceeding under the *Ortiz* framework, there is no reason for Plaintiff to show that a proposed legitimate, non-discriminatory reason for termination was pretextual. Even assuming that this were a burden-shifting case, the employer's proffered nondiscriminatory reason must be legitimate. *Bragg v. Munster Med. Rsch. Found. Inc.*, 58 F.4th 265, 271 (7th Cir. 2023). See also *Perfetti v. First Nat. Bank of Chicago*, 950 F.2d 449, 456 (7th Cir. 1991) ("If at the time of the adverse employment decision the decision-maker gave one reason, but at the time of the trial gave a different reason which was unsupported by the documentary evidence the jury could reasonably conclude that the new reason was a pretextual after-the-fact justification"). In other

41

words, shifting reasons, delay or lack of consistent disciplinary records, and exaggeration show Defendants' reasons for Plaintiff's termination are *ad hoc* pretext.

Defendants argue they terminated Plaintiff's employment because of poor attendance, job abandonment, and failure to submit medical documentation confirming her ability to return to work. They assert that they are allowed to rely on these legitimate nondiscriminatory reasons for discharging Plaintiff, even if they are incorrect about the bases for their conclusions, as long as the explanation is not dishonest. Summary judgment is inappropriate on this ground because there is sufficient "'[p]roof that the defendant's explanation is unworthy of credence.'" *Filar v. Bd. of Educ.*, 526 F.3d 1054, 1063 (7th Cir. 2008) (quoting *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000)).

Defendants' own time records show that Plaintiff took only six sick days during her five months of employment. (PSOF ¶5.) Nonetheless, although Chief Soderstrom frequently texted Plaintiff in connection with a sarcoidosis-related absence a week or so earlier (DSOF ¶55; PSOF ¶ 3), rather than texting her about problems with her attendance, he placed a memorandum of termination in her office mailbox before going on vacation. (DSOF ¶67.) This failure to communicate with Plaintiff contradicted the understanding Plaintiff had reached with Defendants at the time of her hiring that she would be able to take time off for medical appointments related to her disability and set her own schedule as appropriate. (DSOF ¶13.) The fact that five of Plaintiff's six sick days were taken in early November 2021 during her sarcoidosis flare-up (PSOF ¶5), coupled with the fact that Chief Soderstrom composed his memorandum after Plaintiff posted a Facebook message about what she experienced during the flare-up (PSOF ¶4), suggests that the motive for her termination was to get rid of her because of her disability, and not simply to penalize her for poor attendance.

The job abandonment rationale brought forth by Defendants is suspect because it relies on an assumption that Defendants did not terminate Plaintiff with Chief Soderstrum's November 19, 2021 memorandum, but that they instead waited almost four weeks—when Plaintiff conveniently ran out of unpaid leave—to terminate her. Plaintiff disputes that she was terminated later than November 19, 2021. (DSOF ¶78, 80, 81.)

Finally, Defendants' claim that Plaintiff refused to provide medical evidence that she could return to work without limitation is contradicted by Mayor McArty's testimony that she demanded a doctor's note only because Plaintiff had been out several days and not because of concerns about her health (DSOF ¶68) and that the Village did not ask Plaintiff to undergo a fitness for duty examination before returning to work on November 19, 2021 (PSOF ¶7).  Moreover, the November 19, 2021 doctor's note that Defendants declared was unacceptable was no different from a November 3, 2021 doctor's note that Defendants had accepted just a couple of weeks earlier.  (PSOF ¶3.) Defendants' insistence that the note did not say specifically that Plaintiff could work without restrictions is contradicted by the face of the note, which contains no restrictions, and by the testimony of Dr. Stewart who stated that she would have included restrictions if necessary and she would not have signed such a note if she did not believe that Plaintiff could return to work.  (DSOF ¶72, 73, 75, 76.)

Based on the foregoing evidence, a reasonable juror could find that Defendants' "stated nondiscriminatory reason was a lie intended to mask unlawful discrimination." *Liu v. Cook Cnty.*, 817 F.3d 307, 316 (7th Cir. 2016). Accordingly, Defendants are not entitled to summary judgment on the basis that Plaintiff has failed to show that their proffered legitimate nondiscriminatory reasons for Plaintiff's termination were pretextual. Plaintiff has raised a genuine issue of material fact as to whether those grounds are a pretext for unlawful discrimination.

In addition to these shifting reasons provided by Defendants, Plaintiff had returned to work on November 19, and was advised to leave work by the Mayor. The return-to-work note, which Plaintiff had placed in the Chief's inbox at the police station, then mysteriously disappeared. When Plaintiff's attorney provided the Village's attorney with a second copy of the document, it was categorically rejected out of hand. Even putting the physician's note aside, it is also uncontroverted that if there was a concern with Plaintiff returning to work, Defendants did not request any further information from the Plaintiff to determine her fitness for duty.

There's also at a minimum an issue of material fact regarding whether Plaintiff suffered any symptoms of her disability while she was working.  As one example, Anthony Juvinall would oftentimes see Plaintiff in 2021 working at the end of her shift at the time his shift would start. He testified that he a) never saw Plaintiff having trouble getting into her vehicle, b) never had trouble walking, c) never had any trouble with her vision, d) never had any difficultly speaking. Officer Juvinall testified that during the times he worked with Plaintiff, there was nothing that gave him concern about her ability to perform her job. (PSOF ¶8)

The true reason for Plaintiff's termination was because the Chief saw a social media post on Facebook from the Plaintiff saying she was having some health problems. Instead of engaging in any sort of interactive process with her, he drafted a memo (with incorrect information) saying that Plaintiff had used up all of her leave time and was considered off work, without pay, as of November 22, 2021.  Quite simply, Defendants considered Plaintiff to be a person who suffered from a disability, and without inquiring into her condition or engaging in any interactive process, terminated her employment. Defendants' request that summary judgment should be granted as to Count I should therefore be denied.

B. **Plaintiff has Established Defendants Failed to Accommodate Her as Alleged in Count II.**

To prevail on the accommodation claim, Plaintiff must show: "(1) she is disabled within the meaning of the ADA, (2) she is qualified to perform the essential functions of her job either with or without reasonable accommodation, and (3) she has suffered from an adverse employment decision because of her disability." *Spurling v. C&M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014).

Defendants' argument under this count fails for numerous reasons. Defendants repeat their argument that Plaintiff was not a qualified individual with a disability, which Plaintiff has previous addressed *supra* and refuted. Second, Defendants proceed under the McDonnell-Douglas framework and states that Plaintiff must show a "convincing mosaic" of circumstantial evidence, a test which the 7th Circuit has set aside. ('Today we reiterate that "convincing mosaic" is not a legal test." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). Instead, the Court must look at the evidence as a whole to determine whether Plaintiff received an accommodation.

The accommodations Plaintiff asked for were requested at the start of her employment, and specifically requested more flexible work hours to allow her to occasionally see a physician. The parties agree that Plaintiff was promised those accommodations at the time she was hired. The hope of any further accommodation came to an abrupt end when Plaintiff was told (incorrectly) that she had used up her leave time and as of November 22, 2021, would be off work without pay.

Moreover, given the circumstances of Plaintiff's hiring, Defendants would be hard-pressed to argue that they did not know that Plaintiff suffered from the disability of sarcoidosis. Indeed, Chief Soderstrom had advertised the SRO position as one that would be well-suited to Plaintiff, given her health condition, because she would work the day shift, run the program as she saw fit, and work her own hours. (DSOF ¶9, 13.) Chief Soderstrom made these representations with the full knowledge that Plaintiff had been diagnosed with sarcoidosis. (PSOF ¶1) Indeed, his recruiting

45

efforts appear to have been directed at Plaintiff because she had sarcoidosis and he believed the SRO position would create less stress for her. The fact that Plaintiff and Defendants did not use the speicfic term "accommodation" when discussing the terms of her employment does not remove the situation from the jurisdiction of the disability provisions of the IHRA.

Similarly, closing off communication and terminating Plaintiff at the first serious challenge to the reasonableness of the agreed-upon accommodation of setting her own schedule is not indicative of the "interactive process" required. The obligation does not end when things get tough. It is extremely simplistic and unfair to argue that the accommodation Plaintiff was requesting was to come to work whenever she felt like it without consequence given her demonstrated willingness to work whenever she was physically able, even when she did not feel her best. Defendants cannot show that they met their duty to engage in an interactive process and, therefore, are not entitled to summary judgment on the failure to accommodate claim. To the extend there are considerable factual differences in the record, summary judgment should be denied as to Count II of Plaintiff's complaint.

C. **Plaintiff Can Establish Retaliation in Count IV Under Title VII and the Illinois Human Right's Act.**

The relevant question for Title VII retaliation claims is whether the record contains "sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused the discharge." *Igasaki*, 988 F.3d at 959.

To prove retaliation, Plaintiff must prove that (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse action. *Scaife v. VA*, 49 F.4th 1109, 1118 (7th Cir. 2022). The first prong of that inquiry is met as Plaintiff engaged in statutory protected activity when the Village hired her with knowledge of her disability and allowed her have a more flexible schedule. In

addition, Plaintiff certainly engaged in protected activity at the conclusion of her employment when she, through her attorney, engaged in statutorily protected activity when inquiring why she wasn't allowed to return to work. The second prong is met because "[a] termination is undoubtedly an adverse employment action*." Bagwe v. Sedgwick Claims Mgmt. Servs.*, 811 F.3d 866, 889 (7th Cir.), *cert. denied*, 580 U.S. 821 (2016).

Circumstantial evidence of discriminatory motive raises genuine issues of material fact as to whether the third prong is met. First, there is the short temporal proximity between the November 19, 2021 involuntary leave and the December 13, 2021 decision to terminate her employment. While "[s]uspicious timing by itself will rarely support an inference of retaliation…it may do so '[w]hen an adverse employment action follows on the close heels of protected expression and the plaintiff can show the person who decided to impose the adverse action knew of the protected conduct.'" *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 564 (7th Cir. 2016) (quoting *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005)). Likewise, given the evidence that Plaintiff was terminated shortly after notifying the Village that she was taking leave, provides for the temporal proximity necessary to show retaliation. Therefore, summary judgment on the retaliation claim is inappropriate.

## CONCLUSION

For the foregoing reasons, the City's motion for summary judgment should be denied as to Counts I, II, and IV of Plaintiff's Complaint.

Dated: May 3, 2024                    Respectfully submitted,

/s/Ronald S. Langacker
Ronald S. Langacker
Langacker Law, Ltd.
210 N. Broadway Ave.
Urbana, Illinois 61801
(217) 954-1025
ron@langackerlaw.com

47

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**
**URBANA DIVISION**

| | | |
|---|---|---|
| **MISTI SMITLEY,** | ) | |
| | ) | |
| **PLAINTIFF,** | ) | |
| | ) | |
| **v.** | ) | **No.: 2:22-cv-2137-CSB-EIL** |
| | ) | |
| **VILLAGE OF OAKWOOD, a Municipal** | ) | |
| **Corporation in Vermilion County, Illinois;** | ) | |
| **CHIEF OF POLICE RONALD** | ) | |
| **SODERSTROM; VILLAGE CLERK** | ) | |
| **JULIE LEVERENZ; and MAYOR** | ) | |
| **HEATHER MCARTY,** | ) | |
| | ) | |
| **DEFENDANTS.** | ) | |

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned attorney of record hereby certifies that on May 3, 2024, he electronically filed the foregoing **Response to Motion for Summary Judgment** with the Clerk of the Court which will provide service of the same to the parties listed below via CM/ECF:

Ms. Jennifer A. Dancy
Tressler, LLP
233 S. Wacker Drive, 61st Floor
Chicago, Illinois 60606
dproctor@tresslerllp.com
jdancy@tresslerllp.com

Respectfully submitted,

/s/Ronald S. Langacker
Ronald S. Langacker, #6239469
Langacker Law, Ltd.
210 N. Broadway Ave.
Urbana, Illinois 61801
ron@langackerlaw.com